NO FEE / ED

1  LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2  DARREN J. ROBBINS (168593)
   RANDALL J. BARON (150796)
3  A. RICK ATWOOD, JR. (156529)
   STEPHEN J. ODDO (174828)
4  DAVID T. WISSBROECKER (243867)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)

7  ROBBINS UMEDA & FINK, LLP
   BRIAN J. ROBBINS (190264)
8  CAROLINE A. SCHNURER (206088)
   610 West Ash Street, Suite 1800
9  San Diego, CA  92101
   Telephone:  619/525-3990
10 619/525-3991 (fax)

11 Co-Lead Counsel for Plaintiff

12          SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                    COUNTY OF SAN DIEGO

14 In re PETCO ANIMAL SUPPLIES, INC.    )   Lead Case No. GIC 869399
   SHAREHOLDER LITIGATION            )
15 _____  )   CLASS ACTION
                                        )
16 This Document Relates To:            )   CONSOLIDATED AMENDED COMPLAINT
                                        )   BASED UPON SELF-DEALING AND
17    ALL ACTIONS.                      )   BREACH OF FIDUCIARY DUTY
                                        )
18 _____  )   DATE ACTION FILED 07/19/06
                                        )
19

20

21

22

23

24

25

26

27

28

---

CONSOLIDATED AMENDED COMPLAINT

## SUMMARY OF THE ACTION

1.    This is a stockholder class action brought by plaintiff on behalf of the public shareholders of PETCO Animal Supplies, Inc. ("PETCO" or the "Company"). The action arises out of efforts by PETCO and its Board of Directors (the "Board" or the "Individual Defendants"), aided and abetted by Company insiders Leonard Green & Partners L.P. ("Leonard Green"), Texas Pacific Group ("TPG") and several of their affiliates and subsidiaries (collectively the "Buyout Group") to complete the sale of PETCO to the Buyout Group on terms preferential to the Buyout Group (the "Proposed Acquisition"), and in the process provide certain PETCO insiders and directors with material benefits that will not be shared with the Company's public shareholders. This action seeks equitable relief only.

2.    Defendants are attempting to complete the Proposed Acquisition at the unfair price of $29 per share despite the fact that an alternate bidder, industry competitor PetSmart Inc. ("PetSmart"), offered the Company $33 per share, and even offered to shoulder a great majority of any financial risk of delay due to antitrust considerations that a transaction between PETCO and PetSmart could face. The terms offered by PetSmart to offset financial risk associated with potential antitrust delay included: (i) a payment of $200 million to PETCO in the event a transaction failed to close for antitrust reasons (the "reverse termination fee"); (ii) a "ticking fee" that would increase the offered consideration at an annual rate of 6% if the transaction failed to close for more than six months after the parties signed a merger agreement; and (iii) $10 million for PETCO to use for workforce retention while the transaction underwent antitrust approval.

3.    Under the terms offered by PetSmart, if the deal passed antitrust scrutiny and closed, as it no doubt would given the lack of concentration in the market for pet products, shareholders would have received an additional $240 million for their interests in the Company. But even if the transaction failed antitrust scrutiny and a merger with PetSmart did not close, the reverse termination fee PetSmart offered would equate to approximately $3.50 per share for PETCO's shareholders. Thus, the PetSmart offer was a "win-win" scenario for PETCO shareholders.

4.    Rather than consider PetSmart's offer in good faith, defendants rejected PetSmart's offer out-of-hand, claiming that, even with PetSmart's offer to structure the deal to eliminate any potential financial burden associated with antitrust clearance, the risk of a transaction being delayed or not being

consummated because of potential antitrust hurdles was too great. Defendants made such a claim despite the fact that PETCO and PetSmart together represent only 15%-17% of the market for pet products, an industry dominated not by specialty stores such as PETCO and PetSmart, but general merchandisers, or "big box" stores, such as Wal-Mart and Target.

5.     Defendants refused to accept the PetSmart offer, or continue to negotiate in good faith with PetSmart to structure a deal that would maximize shareholder value, because they are beholden to the Buyout Group, Company insiders who were intent on purchasing the Company on the cheap, and because PetSmart refused to make assurances that certain Board members and existing Company management, including defendants Brian K. Devine ("Devine"), the Company's Chairman of the Board, and James M. Myers ("Myers"), a director and the Company's Chief Executive Officer ("CEO"), would be able to keep their jobs post-acquisition.

6.     This is not the first time PETCO catered a sale of the Company to the identical Buyout Group on terms unfavorable to the Company's public shareholders. PETCO facilitated the Buyout Group's purchase of the Company for $600 million in 2000, an amount that included a minimal equity contribution by the Buyout Group of $190 million. After purchasing the Company, the Buyout Group took the Company private, and then public again in 2002 in an initial public offering ("IPO") that was valued at over $1 billion. In the IPO and the following two years, the Buyout Group sold its 100% ownership interest in the Company back to PETCO's public shareholders, in the process making *$1.2 billion, meaning that it reaped a profit of over 600% through its scheme*. Essentially, the Buyout Group has made the Company its personal piggybank and intends to do so again if the Proposed Acquisition is consummated.

7.     Defendants' willingness to forgo their fiduciary duties to shareholders and sell the Company to the Buyout Group at a reduced price compared to the PetSmart offer is not surprising. Defendants Myers, the Company's CEO, Devine, the Chairman of the Board, and John G. Danhakl ("Danhakl"), a director and Leonard Green partner, were employed by the Buyout Group when it previously owned PETCO. Two other defendants, Charles W. Duddles ("Duddles") and Julian C. Day ("Day"), served as Company directors when PETCO was under the Buyout Group's ownership. In addition, two more defendants, David B. Appel ("Appel"), and Sandra N. Bane ("Bane") were

CONSOLIDATED AMENDED COMPLAINT

1  Company directors during the time that the Buyout Group still held a large interest in the Company

2  following the 2002 IPO.  Thus a total of seven of the Board's nine directors have significant prior or

3  current relationships with the Buyout Group, and most of these defendants were allowed to staff the

4  supposedly independent "special committee" that was purportedly formed to protect shareholders'

5  interests in the sales process.  All of these interested defendants, except Danhakl, were actually allowed

6  to cast their vote recommending that PETCO shareholders approve the Proposed Acquisition.

7       8.      The offer from PetSmart was also an all-equity deal.  The Proposed Acquisition, worth

8  $1.8 billion, will by contrast be financed by $1.35 billion in Company debt.

9       9.      On August 11, 2006, as a precursor to seeking shareholder approval of the Proposed

10  Acquisition, defendants filed with the Securities and Exchange Commission ("SEC") a preliminary

11  Proxy (the "Proxy") that omitted or misrepresented material information regarding the Proposed

12  Acquisition, including, among other things, material information regarding: (i) the Company's current

13  and future value; (ii) benefits that will flow to Company insiders only as a result of the Proposed

14  Acquisition; and (iii) the events leading up to the Proposed Acquisition.   Without this material

15  information, the Company's public shareholders are precluded from casting a fully informed vote on the

16  Proposed Acquisition.

17       10.     In pursuing the foregoing unlawful plan to sell PETCO, each of the defendants violated

18  applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary

19  duties of loyalty, due care, independence, candor, good faith and fair dealing.

20       11.     Defendants are required to act in the best interests of PETCO and its public stockholders

21  and ensure that no conflicts of interest exist between defendants' own interests and their fiduciary

22  obligation to advance the interests of shareholders, by, among other things, acting in good faith with the

23  objective of maximizing shareholder value.  Defendants must immediately terminate their refusal to

24  maximize shareholder value and act to protect and advance the interests of PETCO and its public

25  shareholders, to whom defendants owe the highest duty known to the law, by, among other things,

26  considering in good faith the offer from PetSmart and other strategic alternatives for the Company, and

27  providing shareholders with a fair process.

28

CONSOLIDATED AMENDED COMPLAINT

1    12.    Immediate judicial intervention is warranted here to rectify existing and future

2  irreparable harm to the Company's shareholders.  Plaintiff, on behalf of the Class, seeks only to level

3  the playing field and to ensure that if shareholders are to be ultimately stripped of their respective equity

4  interests through the Proposed Acquisition, that the Proposed Acquisition is conducted in a manner that

5  is not overtly improper, unfair and illegal.

6                          **JURISDICTION AND VENUE**

7    13.    This Court has jurisdiction over defendants because they conduct business in California

8  and/or are citizens of California.  This action is not removable.

9    14.    (a)    Venue is proper in this Court because the conduct at issue took place and had an

10  effect in this County.

11          (b)    PETCO's principal place of business is located at 9125 Rehco Road, San Diego,

12  California and defendants Devine and Myers are residents and citizens of California.

13                                **PARTIES**

14    15.    Plaintiff Bill J. Harris is and at all times relevant hereto, was, a shareholder of PETCO.

15    16.    Defendant PETCO, a Delaware corporation, operates as a specialty retailer of pet food,

16  supplies and services.  As of January 28, 2006, the Company operated 779 stores in 49 states and the

17  District of Columbia.  PETCO is headquartered in San Diego, California.

18    17.    Defendant Leonard Green, is a private equity firm that serves as the management

19  company to Green Equity Investors IV, L.P. ("GEI").

20    18.    Defendant GEI is a private equity fund that Leonard Green formed in 2002 for the

21  purposes of making investments in securities of public and private corporations.

22    19.    Defendant GEI Capital IV, LLC ("GEI Capital") is an entity whose sole business is

23  acting as the sole general partner of GEI.  GEI Capital is managed in part by defendant Danhakl.

24    20.    Defendant TPG is a private equity investment firm that controls TPG Partners V, L.P.

25  ("TPG V").

26    21.    Defendant TPG V is a private equity fund formed by TPG in 2006 for the purpose of

27  making investments in securities of public and private corporations.

28

CONSOLIDATED AMENDED COMPLAINT

22.    Defendant TPG GenPar V, L.P. ("TPG GenPar") is a Delaware limited partnership that serves as the general partner of TPG V.

23.    Defendant TPG Advisors V, Inc. ("TPG Advisors") is a Delaware corporation that serves as the general partner of TPG Gen Par V.

24.    Defendant Rover Holdings Corp. ("Rover Holdings") is an entity formed by GEI and TPG V for the sole purpose of owning PETCO if the Proposed Acquisition is consummated. Rover Holdings is owned by GEI and TPG V. Rover Holdings' principal executive offices are located in Los Angeles, California.

25.    Defendant Rover Acquisition Corp. ("Rover Acquisition") is an entity formed by Rover Holdings solely for the purpose of completing the Proposed Acquisition. Rover Acquisition's principal executive offices are located in Los Angeles, California.

26.    Defendant Devine has served as Chairman of the Board of the Company since January 1994. He joined PETCO in August 1990 and served as President and CEO until March 2004. Devine is controlled by the Buyout Group and participated in and benefited from the Buyout Group's successful 2000 privatization of PETCO and the 2002 IPO, and stands to also benefit in the Proposed Acquisition. Prior to joining the Company, Devine was President of Krause's Sofa Factory, a furniture retailer and manufacturer, from 1988 to 1989. From 1970 to 1988, Devine was employed by Toys "R" Us, a retailer of children's toys, in various executive positions, including Senior Vice President, Director of Stores, and Senior Vice President, Growth, Development and Operations.

27.    Defendant Danhakl has served as a director of the Company since October 2000. Danhakl has served as a partner at Leonard Green since 1995 and was Managing Director at Donaldson, Lufkin & Jenrette Securities Corporation from 1990 to 1995. Danhakl was a Vice President at Drexel Burnham Lambert from 1985 to 1990. Danhakl also serves on the Boards of Directors of The Arden Group, Inc., Big 5 Sporting Goods, Inc., Diamond Auto Glass Works, Liberty Group Publishing, Leslie's Poolmart, Inc., VCA Antech, Inc. and on the Board of Managers of AsianMedia Group LLC.

28.    Defendant Myers is CEO and a director of the Company. He joined PETCO in May 1990 and was named CEO in March 2004. From 1998 to 2004, Myers served as Executive Vice President and Chief Financial Officer ("CFO") of PETCO. From 1996 to 1998, he served as Senior

1  Vice President, Finance and before that as Vice President, Finance and as Vice President and

2  Controller. Myers is controlled by the Buyout Group and participated in and benefited from the Buyout

3  Group's successful 2000 privatization of PETCO and the 2002 IPO, and stands to also benefit in the

4  Proposed Acquisition. From 1980 to 1990, Myers held various positions at the accounting firm of

5  KPMG LLP ("KPMG"), including Senior Audit Manager.

6      29.    Defendant Duddles has served as a director of the Company since March 2002. Duddles

7  is controlled by the Buyout Group and participated and benefited from the Buyout Group's successful

8  2002 IPO, and stands to also benefit in the Proposed Acquisition.

9      30.    Defendant David T. Ching ("Ching") has served as a director of the Company since

10  November 2005. Ching serves as Senior Vice President and Chief Information Officer for Safeway Inc.

11  Prior to joining Safeway in 1994, Ching was General Manager-North America for British American

12  Consulting Group, a software/consulting firm focusing on the distribution and retail industry. From

13  1979 to 1993, Ching was with Lucky Stores Inc., most recently as Senior Vice President of Information

14  Systems. From 1975 to 1979, Ching held information technology management positions at Bell Canada

15  and at Control Data Canada.

16      31.    Defendant Appel has served as a director of the Company since April 2004. Appel

17  serves as Chairman of Orange Glo International, a privately-held marketer of cleaning and home care

18  products. Appel joined Orange Glo in 1999 as Chief Operating Officer, and was named Chairman in

19  2001. Prior to Orange Glo International, Appel was a partner with Accenture (formerly Andersen

20  Consulting), serving retail and consumer goods companies for 17 years in San Francisco, Paris and

21  Tokyo.

22      32.    Defendant Bane has served as a director of the Company since April 2004. Bane is a

23  retired audit partner from KPMG, having served 24 years with the firm. She is a member of the

24  American Institute of Certified Public Accountants and the California Society of CPAs. Bane also

25  serves on the Board of Directors of Big 5 Sporting Goods, Inc. and TransAmerica Premier Funds.

26      33.    Defendant Day has served as a director of the Company since November 2000. Day is

27  controlled by the Buyout Group and participated and benefited from the Buyout Group's successful

28  2000 privatization of PETCO and the 2002 IPO, and stands to also benefit in the Proposed Acquisition.

CONSOLIDATED AMENDED COMPLAINT

1    In March 2002, Day became the President and Chief Operating Officer of Kmart Corporation, and in

2    January 2003, became CEO and a director of Kmart.  In October 2004, Day gave up his executive

3    responsibilities at Kmart following the merger of Kmart and Sears and served as a director of Sears

4    Holdings Corporation until April 2006.  From 1999 to 2000, Day was with Sears Roebuck, most

5    recently as Executive Vice President and Chief Operating Officer. From 1992 to 1998, Day was with

6    Safeway Inc., where he became Executive Vice President and CFO.

7            34.     Defendant Peter Maslen ("Maslen") has served as a director since October 2005.  Maslen

8    is CEO of The HansonMaslen Group, LLC, a private investment, development and consulting firm.

9    From 1999 to 2003, Maslen served as President of Starbucks Coffee International.  Prior to that, he was

10   President of Tricon Restaurants Central Europe (now YUM! Brands, Inc.) and held executive leadership

11   positions at PepsiCo and Mars, Inc. internationally.  Maslen also serves on the boards of Herbalife Ltd.

12   and a number of privately held companies.

13           35.     The true names and capacities of defendants sued herein under California Code of Civil

14   Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore

15   sues these defendants by such fictitious names.  Plaintiff will seek to amend this Complaint and include

16   these Doe defendants' true names and capacities when they are ascertained.  Each of the fictitiously

17   named defendants is responsible in some manner for the conduct alleged herein and for the injuries

18   suffered by the Class.

19           36.     The defendants named above in ¶¶26-34 are sometimes collectively referred to herein as

20   the "Individual Defendants."

21                           **DEFENDANTS' FIDUCIARY DUTIES**

22           37.     In accordance with their duties of loyalty, care and good faith, the Individual Defendants,

23   as directors and/or officers of PETCO, are obligated to refrain from:

24           (a)     participating in any transaction where the directors' or officers' loyalties are

25   divided;

26           (b)     participating in any transaction where the directors or officers receive or are

27   entitled to receive a personal financial benefit not equally shared by the public shareholders of the

28   corporation; and/or

                                    - 7 -

1    (c)    unjustly benefiting enriching themselves at the expense or to the detriment of the

2  public shareholders.

3    38.    Plaintiff alleges herein that the Individual Defendants, separately and together, in

4  connection with the sale of PETCO, violated the fiduciary duties owed to plaintiff and the other public

5  shareholders of PETCO, including their duties of loyalty, good faith and independence, insofar as they

6  stood on both sides of the transaction and engaged in self-dealing and obtained for themselves personal

7  benefits, including personal financial benefits, not shared equally by plaintiff or the Class.

8    39.    Because the Individual Defendants have breached their duties of loyalty, good faith and

9  independence in connection with the sale of PETCO, the burden of proving the inherent or entire

10  fairness of the Proposed Acquisition, including all aspects of its negotiation and structure, is placed

11  upon the Individual Defendants as a matter of law.

12  **CLASS ACTION ALLEGATIONS**

13    40.    Plaintiff brings this action on his own behalf and as a class action on behalf of all holders

14  of PETCO stock who are being and will be harmed by defendants' actions described below (the

15  "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or

16  other entity related to or affiliated with any defendant.

17    41.    This action is properly maintainable as a class action.

18    42.    The Class is so numerous that joinder of all members is impracticable. According to

19  PETCO's SEC filings, there are more than 57 million shares of PETCO common stock outstanding.

20    43.    There are questions of law and fact which are common to the Class and which

21  predominate over questions affecting any individual Class member. The common questions include,

22  *inter alia*, the following:

23    (a)    whether defendants have breached their fiduciary duties of undivided loyalty,

24  independence or due care with respect to plaintiff and the other members of the Class in connection

25  with the Proposed Acquisition;

26    (b)    whether defendants have breached their fiduciary duty to maximize shareholder

27  value in the context of a change of control of the Company;

28

- 8 -

1            (c)      whether the Buyout Group aided and abetted the Individual Defendants in their

2 breaches of fiduciary duty;

3            (d)      whether the Individual Defendants are engaging in self-dealing in connection

4 with the Proposed Acquisition;

5            (e)      whether the Individual Defendants are unjustly benefiting themselves and other

6 insiders or affiliates of PETCO;

7            (f)      whether defendants have breached any of their other fiduciary duties to plaintiff

8 and the other members of the Class in connection with the Proposed Acquisition, including the duties of

9 good faith, diligence, candor and fair dealing;

10            (g)      whether the defendants, in bad faith and for improper motives, have impeded or

11 erected barriers to discourage other offers for the Company or its assets; and

12            (h)      whether plaintiff and the other members of the Class would suffer irreparable

13 injury were the transactions complained of herein consummated.

14      44.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff

15 does not have any interests adverse to the Class.

16      45.     Plaintiff is an adequate representative of the Class, has retained competent counsel

17 experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

18      46.     The prosecution of separate actions by individual members of the Class would create a

19 risk of inconsistent or varying adjudications with respect to individual members of the Class which

20 would establish incompatible standards of conduct for the party opposing the Class.

21      47.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.

22 A class action is superior to other available methods for the fair and efficient adjudication of this

23 controversy.

24      48.     Defendants have acted on grounds generally applicable to the Class with respect to the

25 matters complained of herein, thereby making appropriate the relief sought herein with respect to the

26 Class as a whole.

27

28

CONSOLIDATED AMENDED COMPLAINT

## BACKGROUND TO THE PROPOSED ACQUISITION

49.  PETCO, based in San Diego, California, operates as a specialty retailer of pet food, supplies and services. As of January 28, 2006, the Company operated 779 stores in 49 states and the District of Columbia.

50.  Collectively, the Buyout Group owns 1.8 million shares of the Company's common stock, representing over 3% of the Company outstanding shares.

51.  The Buyout Group has a longstanding relationship with PETCO, defendants to this action and other Company insiders.

52.  In 2000, the Buyout Group launched a successful bid to purchase the Company from its public shareholders, purchasing the Company for only $600 million at a time when the Company's shares were trading for $14.93 a share. The Buyout Group then took the Company private. The Buyout Group's total equity investment in the going-private transaction was only $190 million.

53.  During the Company's existence as a privately-held corporation under the control of the Buyout Group, five of the nine defendants to this action worked directly for the Buyout Group. Specifically, defendant Devine, who is currently the Company's Board Chairman, a position he has held since 1994, worked for the Buyout Group as the Company's President and CEO. Defendant Myers, who is currently the Company's CEO and a director, worked for the Buyout Group as the Company's Executive Vice President and CFO. Defendant Danhakl, who is currently a director of the Company, a position he has held since 2000, is a Leonard Green partner and also worked for the Buyout Group as a Company director. Defendants Day and Duddles, currently directors of the Company, worked for the Buyout Group as Company directors.

54.  In February 2002, the Buyout Group took the Company public again, in an IPO in which they sold 20% of the ownership of the Company for $20 per share. From the time of the IPO in February 2002 until October 2004, the Buyout Group continued to sell shares in various offerings on the open market until it made a final offering in October 2004, when it cashed out its remaining 6.95 million PETCO shares at a price of $35.60 per share. All told, the Buyout Group made over $1.2 billion taking the Company public again. Thus the Buyout Group made a profit of over $1 billion on its

CONSOLIDATED AMENDED COMPLAINT

1   initial $190 million investment, or more than 600% as a result of its control of PETCO between 2000

2   and 2004.

3       55.    From the point of the Buyout Group's IPO until it sold its remaining interest in the

4   Company in 2004, seven of the nine defendants to this action worked for the Buyout Group. In addition

5   to defendants Devine, Myers, Danhakl, Day and Duddles, whose employment with the Buyout Group is

6   outlined above in ¶53, defendants Bane and Appel, who are currently directors for the Company,

7   worked for the Buyout Group as Company directors.

8       56.    In the nineteen months between the Buyout Group's cash-out in October 2004 and the

9   announcement of the Proposed Acquisition, the Company's stock price plummeted by 48% as PETCO,

10  along with other specialty retailers in the pet product industry, faced increasing competition from

11  general merchandisers such as Wal-Mart and Target. Due to certain market phenomenon, which

12  included the repositioning of premium pet care products from exclusive distribution with specialty

13  retailers like PETCO to general merchandisers like Wal-Mart and Target, PETCO's market share

14  declined significantly.

15      57.    Big-box stores such as Wal-Mart and Target have also taken a dominant position in the

16  market because they have turned large sections of their stores into dog and cat centers, often using

17  packaged dog and cat foods – the foundation of both PETCO's and PetSmart's businesses – as loss

18  leaders to train customers to forgo an extra trip to the pet store.

19      58.    By the time of the Proposed Acquisition, former pet product industry giants PETCO and

20  PetSmart had lost their domination of the market, and now collectively control only 15%-17% of the pet

21  product market. Notably, because PETCO's (and PetSmart's) primary competition comes from Wal-

22  Mart and Target, business entities that own stores in every market where PETCO is found, both PETCO

23  and PetSmart now face dominating competition in each and every geographic market for pet care

24  products.

25      59.    An additional reason for the Company's declining stock and market share is that PETCO

26  and PetSmart are squeezed between mass-market retailers such as Wal-Mart, which typically stress low

27  prices, and small mom-and-pop pet stores that offer better hands-on pet services than their larger

28  competitors.

- 11 -

CONSOLIDATED AMENDED COMPLAINT

60.    Moreover, former pet product industry leaders PETCO and PetSmart increasingly are being squeezed by nontraditional competitors like Bed, Bath & Beyond, 99-cent style stores and mall-kiosk operators selling pet-related trinkets.

61.    The rise in gas prices has also served to undercut PETCO and PetSmart's market share as customers have eschewed high-margin goods to spend more on gasoline and other necessities. Often times consumers choose to make one trip to a big-box store such as Wal-Mart or Target where they can purchase pet products as well as other goods, instead of making an extra trip and using more gas to seek out a PETCO or PetSmart.

62.    The Buyout Group watched PETCO's declining share price and market share with interest. Having made over $1 billion taking the Company private and then public again once, the Buyout Group saw their opportunity to run through the cycle again in an attempt to squeeze millions or billions more from the Company's public stockholders. The Buyout Group knew that, because its former employees still ran the Company, it would have the inside track to repurchasing PETCO from its public shareholders.

63.    The Buyout Group also knew, that because of its intimate knowledge of PETCO from its previous ownership, and because virtually the same management team controlled the Company, it could quickly and easily execute a strategy to squeeze millions in profit from PETCO and then take it public again to net billions of dollars.

64.    Accordingly, in late 2005, the Buyout Group started to surreptitiously repurchase the Company's shares on the open market through GEI, an entity controlled by defendant Danhakl. By the time the Buyout Group formally approached the Board with the Proposed Acquisition, it controlled 3.2% of the Company's shares.

65.    The Buyout Group's official approach to the Board came on March 25, 2006, when Danhakl announced to the Board that the Buyout Group intended to make a bid for the Company, which Danhakl delivered to the Board on March 30, 2006. The Buyout Group's first bid was for $26.50 per share, which was only a 12.2% premium to the Company's then-trading price of $23.62.

66.    On April 5, 2006, defendants set up a sham "special committee" to consider the Buyout Group's proposal. Although the special committee was supposed to consist of Board members

CONSOLIDATED AMENDED COMPLAINT

independent from the Buyout Group, of the six defendants chosen, only two had no overt prior affiliation with the Buyout Group (Ching and Maslen). The remaining four defendants – a majority of the special committee – had either served as directors when the Buyout Group owned the Company outright or had been directors of the Company when the Buyout Group still had a controlling interest (Day, Duddles, Appel and Bane).

67.    The special committee received significant economic remuneration for conducting the process that resulted in the Proposed Acquisition. Each special committee member received $2500 for each scheduled meeting of the special committee, $1500 for each telephonic meeting, and was also reimbursed for all his other expenses. The special committee chairman, defendant Appel, received an additional $6000 for serving as chair. The Proxy does not disclose the total amount received by each special committee member in exchange for selling the Company to the Buyout Group.

68.    The special committee retained Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), as its legal advisor. Based on a review of the Proxy, Pillsbury's sole duty as advisor to the special committee was to erect barriers to an alternate proposal by PetSmart by articulating non-existent antitrust risks that a merger between PETCO and PetSmart could purportedly pose.

69.    The special committee also retained UBS Securities LLC ("UBS") to serve as its financial advisor. UBS, however, is too conflicted to offer competent advice, due to prior compensation it has received for services rendered to the Buyout Group and the Company. The Proxy fails to disclose the extent of these prior engagements.

70.    On April 17, 2006, PetSmart approached an unidentified member of the special committee with an unsolicited proposal to purchase the Company for between $30 and $32 per share. Along with its proposal, PetSmart gave the Company explicit assurances that it had conducted a thorough review of the antitrust implications of a potential merger and had concluded that no significant antitrust barriers existed, and that antitrust clearance could be obtained without much delay.

71.    The special committee met with its advisors on May 5 and May 8, 2006. At these meetings, UBS offered preliminary analysis of the Buyout Group and PetSmart proposals. The Proxy does not disclose the conclusions of these analyses.

CONSOLIDATED AMENDED COMPLAINT

72.     At these same meetings, the special committee was informed by Pillsbury about potential antitrust hurdles that "could be factors" in a transaction with PetSmart, including the usual regulatory hurdles such as filings under the Hart-Scott-Rodino Antitrust Improvement Act of 1976 ("HSR"), a possible second HSR request and a challenge to merger by the Federal Trade Commission. The special committee was not told at this meeting whether or not a merger with PetSmart would fail to overcome any of these hurdles.

73.     In fact, although the Proxy identifies Pillsbury as the source of information and advice given to the special committee regarding the potential for antitrust risks in a merger between PETCO and PetSmart, the Proxy fails to disclose the substance of the advice given by Pillsbury. Indeed, no where does the Proxy actually state whether Pillsbury explicitly told the special committee that a merger between PETCO and PetSmart posed more risk of antitrust clearance than was justified by the superior proposal from PetSmart. In other words, despite listing numerous meetings with Pillsbury where potential antitrust risk was discussed, the Proxy does not disclose whether Pillsbury ever advised the special committee not to pursue a merger with PetSmart for antitrust reasons. This is in stark contrast with the Proxy's discussion of advice offered by UBS, who, according to the Proxy, explicitly advised the special committee regarding the financial propriety of the Proposed Acquisition.

74.     At the May 8, 2006, meeting, the special committee determined that a sale of the Company was inevitable.

75.     At this same meeting, the special committee also determined that it would not shop the Company or conduct an auction of any sort, and would limit its consideration of potential acquirers to the Buyout Group and PetSmart.

76.     On May 17, 2006, the special committee approved amendments to "retention agreements" it had with certain of the Company's "core" employees, including four PETCO Vice Presidents. The amendments doubled those employees' current severance benefits.

77.     On May 30, 2006, at the urging of Pillsbury, the special committee retained an economist to assist Pillsbury in assessing the potential for antitrust risk in a merger with PetSmart. The Proxy does not identify who this economist is, nor does the Proxy set forth whether this unnamed

- 14 -
CONSOLIDATED AMENDED COMPLAINT

1  economist ever presented any conclusions to the Board regarding the extent of potential antitrust risk

2  involved in a merger with PetSmart.

3      78.    On June 2, 2006, defendants for the first time discussed putting in place a "Company-

4  wide retention program" that would have the effect of entrenching the Company's entire workforce and

5  thereby making the Company less attractive to potential strategic acquirers such as PetSmart, which

6  would likely seek to take advantage of synergies by concentrating certain sectors of the combined

7  company's management and workforce.  With such a retention program in place, a strategic buyer

8  would have difficulty making any changes to the Company's employee structure.

9      79.    On June 15, 2006, defendants provided a set of management projections to the Buyout

10  Group.  These projections are not disclosed in the Proxy.

11      80.    On June 16, 2006, the special committee determined that, despite the absence of any

12  significant risk that a merger with PetSmart would clear antitrust hurdles, it would attempt to shift any

13  possible risk onto PetSmart in an effort to convince PetSmart that a transaction was not worth pursuing.

14  The special committee determined to impose a "hell or high water" provision on PetSmart that would

15  require PetSmart to do whatever it took to consummate a merger, including divest its own assets.  The

16  special committee also determined to ask for a "ticking fee" that would increase the merger

17  consideration if regulatory approval took more time than PetSmart expected.

18      81.    In an attempt to waylay any concern that antitrust risk could pose an obstacle to a merger

19  between PETCO and PetSmart, PetSmart made available to the special committee and Pillsbury its

20  antitrust analysis, including an econometric analysis of both PETCO and PetSmart.  Not surprisingly,

21  the special committee and Pillsbury declared PetSmart's analysis "optimistic."

22      82.    On June 29, 2006, PetSmart responded to the special committee's demands that it agree

23  to a "hell or high water provision" and the payment of a ticking fee.  For good reason, PetSmart rejected

24  the demand for a hell or high water provision, but told the special committee it would agree to a ticking

25  fee payable if a transaction was not consummated after six months, and a reverse termination fee

26  payable to PETCO if regulatory approval took longer than 18 months.

27      83.    Because their plan to "scare-off" PetSmart had failed for the time being, the special

28  committee attempted to drum up other methods of extinguishing PetSmart's interest.  First, the special

CONSOLIDATED AMENDED COMPLAINT

1  committee declared PetSmart's positive econometric analysis of antitrust issues in the potential merger

2  flawed, opining that it "might be considered unreliable." Next, the special committee sought to impose

3  the additional requirement on PetSmart that it provide a fund for the Company to use in instituting its

4  Company-wide retention program. And the special committee rejected PetSmart's offer of a reverse

5  termination fee as inadequate.

6       84.    On June 30, 2006, the Buyout Group raised its offer to $27 per share.

7       85.    On July 6, 2006, PetSmart had its antitrust advisors make a presentation directly to the

8  special committee in an effort to disabuse the special committee of its incorrect view of the potential

9  antitrust risk involved in a merger between PetSmart and PETCO, which between the two companies

10 hold only a 15%-17% share of the market, and face stiff competition in all product line and geographic

11 areas from big-box stores such as Wal-Mart and Target, and the countless other vendors which sell the

12 same products as PetSmart and PETCO.

13      86.    The special committee refused to take a different view of purported antitrust risks in a

14 potential merger with PetSmart, and gave its view that PetSmart and its advisors were flat wrong.

15      87.    Undaunted, PetSmart revised its proposal upward on July 7, 2006, offering $32 per share

16 and a reverse termination fee of $200 million. The special committee determined to reject PetSmart's

17 revised proposal, finding a different reason for doing so this time: PetSmart had not agreed to fully fund

18 defendants' proposed Company-wide retention program.

19      88.    Nonetheless, the special committee realized that it could not reject PetSmart out-of-hand,

20 given the much larger premium it had offered, $32 per share, as compared to the Buyout Group's much

21 lower offer of $27 per share. Accordingly, on July 7, 2006, the Special Committee offered to pay the

22 Buyout Group a "remain patient" fee of $3 million dollars for their expenses to date, and an additional

23 $750,000 per day until July 12, 2006 – the date that the Buyout Group had purportedly threatened to

24 walk away if the Board did not accept the terms of the Proposed Acquisition.

25      89.    Realizing that PetSmart was not willing to drop their proposal despite the special

26 committee's unreasonable demands, on July 8, 2006 the special committee made a final demand of

27 (i) $33 per share; (ii) a 7.8% ticking fee; (iii) a $200 million reverse termination fee; and (iv) a non-

28 refundable *$50 million to fund a Company-wide retention program.*

CONSOLIDATED AMENDED COMPLAINT

90.     PetSmart was not prepared to fund a retention program for existing management. PetSmart has its own management and had no legitimate business reason to retain PETCO's existing management.  To do so would be a waste of resources and undercut the value of potential synergies PetSmart would gain in a merger with PETCO.

91.     Accordingly, on July 9, 2006, PetSmart sent a response proposal to the special committee that essentially mirrored the special committee's demand, save for the extensive Company-wide retention program the special committee had insisted upon.  PetSmart proposed terms included: (i) $33 per share; (ii) a 6% ticking fee; (iii) a $200 million reverse termination fee; and (iv) $10 million to fund a Company-wide retention program for only the non-senior executive officers.

92.     On July 10, 2006, having received nearly all it had asked of PetSmart aside from commitments for continuing employment for senior management as part of its Company-wide retention program, the special committee again decided to alter the parameters of the negotiation, demanding, among other assurances, an increase in consideration to at least $33.25 a share.

93.     At this point, PetSmart grew exasperated with the special committee.  PetSmart had given in to nearly all of the special committee's demands, except for inclusion of PETCO senior management in the Company-wide retention program that the special committee had insisted upon. PetSmart had even given the special committee extraordinary assurances with respect to potential antitrust hurdles, even though PetSmart's own advisors had concluded that any supposed antitrust concerns were insubstantial.  Nevertheless, PetSmart was determined to keep negotiating and next asked to meet with the special committee face-to-face to attempt to work out any remaining issues if possible.

94.     During this meeting, which was held on July 12, 2006, it became clear to PetSmart that no matter what it was prepared to offer, the special committee would find some way to reject it, either by citing non-existent antitrust concerns or refusing to carve existing senior management out of the Company-wide retention program it was insisting upon.  Remarkably, at the conclusion of these discussions, the special committee proclaimed that it was no longer willing to proceed with a transaction with PetSmart even if it offered $33.25 a share, a price that the special committee had stated it would accept just two days earlier.

CONSOLIDATED AMENDED COMPLAINT

95.    In the midst of this game of chicken, on July 13, 2006, the Buyout Group upped its bid to a mere $29 a share. UBS instantly stated that it was prepared to declare the Buyout Group's offer fair to shareholders, despite the fact that PetSmart's offer of $33 was still on the table.

96.    Without making any attempt to continue negotiations with PetSmart, that same day, July 13, 2006, the special committee voted to approve the Proposed Acquisition, and recommend the Proposed Acquisition to the full Board. Not surprisingly, later that day, the full Board (the special committee plus the materially conflicted Devine and Myers – only Leonard Green partner Danhakl recused himself from the vote) met to approve the Proposed Acquisition and recommend it to shareholders.

97.    Also at this meeting the Board approved "certain technical amendments" to Devine and Myers' employment agreements, the substance of which the Proxy does not disclose. Also not disclosed is the extent of similar amendments to the employment agreement for management member Hall.

## THE PROPOSED ACQUISITION

98.    On July 14, 2006, the Company issued a press release entitled "PETCO Animal Supplies, Inc. to be Acquired by Texas Pacific Group and Leonard Green & Partners, L.P. for $29.00 per Share in Cash," which stated in part:

> PETCO Animal Supplies, Inc., a leading specialty retailer of premium pet food, supplies and services, announced today that it has entered into a definitive agreement to be acquired by two private equity investment firms, Leonard Green & Partners, L.P. and Texas Pacific Group, for $29.00 per share in cash. The total value of the transaction, including assumed debt, is approximately $1.8 billion. . . .

99.    As part of the Proposed Acquisition, Company management and certain defendants will keep their jobs with the surviving entity, including defendants Devine and Myers.

100.    Defendant Devine has an employment agreement that rewards him for serving as Board chairman. Devine's employment agreement is for three years, but by its terms is continually extended until the Company gives notice that the agreement will cease being perpetually extended. Devine's agreement provides for a base salary plus a bonus and stock options. In 2004 he earned $2,083,653 in salary and bonuses plus stock options valued at as much as $5,662,567, and earned at least that much in 2005, although the full amount of his 2005 earnings is not disclosed in any of the Company's public

- 18 -

1   filings.  Devine will continue to be employed under these same terms by the Buyout Group if the

2   Proposed Acquisition is consummated.

3        101.    Even if Devine's employment is terminated within 12 months of the Proposed

4   Acquisition, under the terms of his golden parachute agreement he will be paid three years' salary and

5   bonus plus receiving tax gross-ups.  Devine also has a 20-year consulting agreement with the Company

6   that will kick in after his employment agreement terminates and pay him 25% of his last year's annual

7   salary for the first 10 years, and then 50% of his last year's annual salary for the last 10 years.

8        102.    Defendant Myers has an employment agreement that rewards him for serving as CEO.

9   Myers' employment agreement is for three years, but by its terms is continually extended until the

10  Company gives notice that the agreement will cease being perpetually extended.  Myers' agreement

11  provides for a base salary plus a bonus and stock options.  In 2004 he earned $1,221,158 in salary and

12  bonuses plus stock options valued at as much as $5,662,567, and earned at least that much in 2005,

13  although the full amount of his 2005 earnings is not disclosed in any of the Company's public filings.

14  Myers will continue to be employed under these same terms by the Buyout Group if the Proposed

15  Acquisition is consummated.

16       103.    Even if Myers' employment is terminated within 12 months of the Proposed Acquisition,

17  under the terms of his golden parachute agreement he will be paid 18 months' salary and bonus plus

18  receiving tax gross-ups.

19       104.    All the Individual Defendants also received personal material benefits for agreeing to

20  vote in favor of the Proposed Acquisition – the monetization of illiquid stock options and restricted

21  stock holdings that will vest only if the Proposed Acquisition is consummated.  Specifically, Devine

22  will receive $2,369,600; Myers, $2,132,800; Duddles, $179,880; Maslen, $126,750; Ching, $116,500;

23  Day, $51,150; Appel, $30,870; Bane, $30,870; and Danhakl, $25,830.

24       105.    The Proposed Acquisition included a provision that enabled the special committee to

25  conduct a so-called "market test" for 20 business days after entering into the Proposed Acquisition.  The

26  "market test" purportedly allowed the Company to pursue a merger with third parties.  The terms of the

27  Proposed Acquisition, however, called for the payment of a $30 million termination fee to the Buyout

28  Group if this so-called market test turned up a successful alternate bidder.  Not surprisingly, given the

- 19 -

CONSOLIDATED AMENDED COMPLAINT

1    added $30 million buyer's fee built into a potential merger agreement with PETCO, none of the entities

2    contacted by UBS during this so-called market test expressed any serious interest. The Proxy does not

3    disclose who was contacted, whether any of those contacted had the resources to complete a merger, or

4    what was in the script that UBS used when contacting these third parties during the "market test."

5         106.    Leonard Green had little or no concern that the market test would produce a threat to the

6    Proposed Acquisition. It has employed the same mechanism numerous times in the past to create the

7    false impression that its acquisition target was discharging its duty to conduct an auction process. But it

8    knows that financial buyers rarely "jump" deals of those, like the Buyout Group, with whom they will

9    likely have to negotiate or partner, in the near future. And the only strategic buyer with sufficient

10   resources and a synergistic upside – PetSmart – was already spurned. Not surprisingly, the market test

11   for PETCO produced no alternate bidders.

12        107.    Surprisingly, UBS did contact PetSmart. PetSmart had already realized, however, that

13   defendants had no intention of facilitating a successful bid by PetSmart for the Company, and that

14   defendants were entirely committed to a sale of the Company the Buyout Group, no matter what the

15   cost to shareholders. Thus PetSmart chose not to make another offer for the Company, and incur more

16   needless costs in a futile effort to buy a Company that was for sale, but only to one bidder – the Buyout

17   Group. Notably, PetSmart had already spent $2.5 million in mounting its unsuccessful bid for the

18   Company.

19        108.    Defendants also inserted various deal protection provisions into the Proposed

20   Acquisition to ensure that, now that the so-called "market test" period is over, no alternate bidders for

21   the Company will emerge. Among the preclusive lock-up devices installed in the Proposed Acquisition

22   are: (i) a one-way matching rights provision; (ii) a no-shop/no-talk provision; and (iii) a $50 million

23   break-up penalty clause that PETCO will have to pay the Buyout Group if a successful alternate bidder

24   surfaces.

25        109.    On August 24, 2006, the Company announced that the process of selling the Company to

26   the Buyout Group cost the Company's public shareholders $4.7 million.

27

28

CONSOLIDATED AMENDED COMPLAINT

110.    In rejecting PetSmart's entreaties and failing to negotiate in good faith with PetSmart, and then accepting the much lower bid from the Buyout Group, the Board breached its fiduciary duties to the Company's shareholders.

111.    The Board rejected the PetSmart bid despite the fact that it would have increased the value of the deal by $240 million for the Company's public shareholders.

112.    The PetSmart bid was a no-lose situation for the Company's shareholders.  Under the terms offered by PetSmart, even if antitrust issues had derailed a merger of PETCO and PetSmart, or caused such a merger to take longer than 18 months to close, the Company and its shareholders would have been paid a reverse termination fee of $200 million, an amount equivalent to $3.50 per share for PETCO shareholders.  And, if such merger had taken any longer than six months to close, PETCO shareholders would have received 6% interest tacked onto the already sizable premium PetSmart offered in the deal.

113.    The Board had no valid reason to reject the PetSmart offer.  Although the special committee claimed to have received information and advice that led it to believe that antitrust concerns would present significant delays and pose a significant risk of non-consummation, such beliefs have no basis in reality and become nothing more than a "makeweight excuse."  As the econometrics preformed by PetSmart's advisors and presented to the Special Committee demonstrated, neither PetSmart nor PETCO owns such a dominating share of the market for pet products that a combination of the companies would pose any serious risk of reducing competition in the market for pet products, no matter how narrowly or broadly the market is defined.

114.    The Companies together hold a collective 15%-17% share of the market for pet products.  Such a small percentage of resulting market share does not trigger any heightened level of scrutiny of a potential merger.

115.    Recent trends in the pet product industry demonstrate that, if anything, specialty stores such as PETCO and PetSmart face a rapidly declining market share because of direct competition from big box stores such as Wal-Mart and Target, and various other vendors small and large, who now sell the very products that form PETCO and PetSmart's product base at lower prices.  Whereas historically PETCO and PetSmart had dominating roles in the pet product industry because they were the only

CONSOLIDATED AMENDED COMPLAINT

1   vendor to sell certain products, or to sell a diverse set of products in one location, now many vendors

2   sell these specialty products and all in one place. Thus, a combined PETCO and PetSmart would not

3   posses the market share with respect to particular products that would enable the combined company to

4   leverage market power to raise prices while reducing costs. If anything, a combination of the two

5   companies would create synergies that would enable the surviving entity to reduce prices to better

6   compete with big-box stores and other competitors, thus benefiting consumers.

7        116.   And because PETCO's and PetSmart's competitors are a force in each and every market

8   where PETCO and PetSmart have stores, there is also no risk that a combination would create undue

9   concentration in any particular geographic market. Thus, a combined PETCO and PetSmart would have

10  no power to raise prices while reducing costs in any particular geographic area.

11       117.   In short, none of the indicia of market power that might cause significant antitrust

12  scrutiny would be generated by a PETCO/PetSmart combination. The Board and the special

13  committee's conclusion to the contrary was ill-reasoned, irresponsible and an excuse given in bad faith

14  to ensure that the Buyout Group was selected as the winning bidder in the special committee's unfair

15  process.

16       118.   The Board and the special committee's refusal to negotiate in good faith with PetSmart,

17  despite PetSmart's repeated concessions to the Board's unreasonable demands, was a breach of the

18  Board's fiduciary duties to shareholders. These breaches of fiduciary duty were aided and abetted by

19  the Buyout Group, which exercised its influence over the Board and the Company, exploited the various

20  conflicts of interest between the Board, the Company, its advisors and the Buyout Group to assist the

21  Board in breaching its fiduciary duty. As demonstrated by the foregoing allegations, the negotiations

22  between the Board and the Buyout Group were anything but arms-length, and involved the promise of

23  material benefits to certain members of the Board and management in exchange for breaching their

24  fiduciary duties to the Company's public shareholders.

25       119.   On August 11, 2006, defendants filed the Proxy with the SEC in anticipation of it being

26  disseminated it to PETCO's shareholders who will be asked to vote their interests in favor of the

27  Proposed Acquisition. The Proxy is materially misleading because it fails to disclose or materially

28  misrepresents certain material information regarding the Proposed Acquisition, including:

- 22 -

1          (a)     material information regarding the Company's current and future value, including

2  the management projections that were provided to UBS and the Buyout Group;

3          (b)     material information regarding the assumptions underlying the analyses

4  performed by UBS in declaring the Proposed Acquisition fair;

5          (c)     material information regarding actual and potential material conflicts of interest

6  that burden the Board and its financial advisors, including material benefits which will flow to the

7  Board and other Company insiders that will vest only if the Proposed Acquisition is consummated;

8          (d)     material information regarding the events leading up to the Proposed Acquisition,

9  including information regarding the special committees purported consideration of supposed antitrust

10  concerns involved in a merger with PetSmart, and the context of its discussions with the Buyout Group;

11          (e)     material information regarding the Buyout Group's prior ownership of the

12  Company and the Buyout Group's relationship with various Board members and other Company

13  insiders; and

14          (f)     material information regarding the "market test" undertaken by UBS, including

15  what criteria was used in deciding who to contact, who was actually contacted and what was told to

16  those contacted.

17                               **SELF-DEALING**

18      120.    By reason of their positions with PETCO, the Individual Defendants are in possession of

19  non-public information concerning the financial condition and prospects of PETCO, and especially the

20  true value and expected increased future value of PETCO and its assets, which they have not disclosed

21  to PETCO's public shareholders. Moreover, despite their duty to maximize shareholder value, the

22  defendants have clear and material conflicts of interest and are acting to better their own interests and

23  those of the Buyout Group at the expense of PETCO's public shareholders.

24      121.    The Proposed Acquisition is wrongful, unfair and harmful to PETCO's public

25  shareholders and represents an effort by defendants to aggrandize their own financial position and

26  interests and those of the Buyout Group at the expense of and to the detriment of Class members. The

27  Proposed Acquisition is an attempt to deny plaintiff and the other members of the Class their rights

28  while usurping the same for the benefit of the Buyout Group on unfair terms.

122. In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the sale of PETCO and allow the shares to trade freely, without impediments;

- Negotiate in good faith with alternate potential acquirers such as PetSmart;

- Act independently so that the interests of PETCO's public shareholders will be protected, including, but not limited to, the retention of truly independent advisors and/or the appointment of a truly independent special committee;

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of PETCO's public shareholders; and

- Immediately disclose all material information regarding the Company and the Proposed Acquisition omitted from or misrepresented in the Proxy.

**FIRST CAUSE OF ACTION**

**Claim for Breach of Fiduciary Duties**

123. Plaintiff repeats and realleges each allegation set forth herein.

124. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, aided and abetted by the remaining defendants, have failed to exercise the care required, and have breached their duties of loyalty, good faith, candor and independence owed to the shareholders of PETCO, among other things:

(a) placing their own interests and those of the Buyout Group ahead of those of PETCO's public shareholders;

(b) failing to maximize shareholder value;

(c) failing to negotiate in good faith with alternate potential acquirers such as PetSmart;

(d) erecting improper barriers to higher offers through improper lock-up devices; and

(e) failing to disclose material information to PETCO's shareholders.

125. Because the Individual Defendants, aided and abetted by the remaining defendants, dominate and control the business and corporate affairs of PETCO, and are in possession of private corporate information concerning PETCO's assets, business and future prospects, there exists an

- 24 -
CONSOLIDATED AMENDED COMPLAINT

1    imbalance and disparity of knowledge and economic power between them and the public shareholders

2    of PETCO which makes it inherently unfair for them to pursue any proposed transaction wherein they

3    will reap disproportionate benefits.

4        126.    Unless enjoined by this Court, the Individual Defendants, aided and abetted by the

5    remaining defendants, will continue to breach their fiduciary duties owed to plaintiff and the Class, will

6    continue to refuse to engage in arm's-length negotiations on the Proposed Acquisition's terms and may

7    consummate the unfair Proposed Acquisition without giving good faith consideration to competing

8    offers to purchase the Company and without the disclosure of all material information necessary to

9    enable them to cast informed votes on the Proposed Acquisition, all to the irreparable harm of the Class,

10   as aforesaid.

11       127.    As a result of the actions of defendants, plaintiff and the Class will suffer irreparable

12   injury as a result of defendants' self-dealing.

13       128.    Plaintiff and the members of the Class have no adequate remedy at law. Only through

14   the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the

15   immediate and irreparable injury which defendants' actions threaten to inflict. The Individual

16   Defendants have violated fiduciary duties of care, loyalty, candor and independence owed under

17   applicable law to the public shareholders of PETCO and have acted to put their personal interests ahead

18   of the interests of PETCO's shareholders.

19                              **PRAYER FOR RELIEF**

20       WHEREFORE, plaintiff demands preliminary and permanent injunctive relief in his favor and

21   in favor of the Class and against defendants as follows:

22       A.    Declaring that this action is properly maintainable as a class action;

23       B.    Declaring and decreeing that the Proposed Acquisition agreement was entered into in

24   breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

25       C.    Enjoining defendants, their agents, counsel, employees and all persons acting in concert

26   with them from consummating the Proposed Acquisition, unless and until the Company adopts and

27   implements a procedure or process to obtain the highest possible price for shareholders;

28

1       D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a

2  transaction which is in the best interests of PETCO's shareholders;

3       E.     Rescinding, to the extent already implemented, the Proposed Acquisition and proposals,

4  voting agreements and termination fees associated therewith;

5       F.     Awarding plaintiff the costs and disbursements of this action, including reasonable

6  attorneys' and experts' fees; and

7       G.     Granting such other and further equitable relief as this Court may deem just and proper.

8  DATED: August 28, 2006             LERACH COUGHLIN STOIA GELLER
                                RUDMAN & ROBBINS LLP

9                       DARREN J. ROBBINS
                       RANDALL J. BARON

10                     A. RICK ATWOOD, JR.
                     STEPHEN J. ODDO

11                     DAVID T. WISSBROECKER

12

13                                   RANDALL J. BARON

14

15                     655 West Broadway, Suite 1900
                     San Diego, CA 92101

16                     Telephone: 619/231-1058
                     619/231-7423 (fax)

17                     ROBBINS UMEDA & FINK, LLP

18                     BRIAN J. ROBBINS
                     CAROLINE A. SCHNURER

19                     610 West Ash Street, Suite 1800
                     San Diego, CA 92101

20                     Telephone: 619/525-3990
                     619/525-3991 (fax)

21                     Co-Lead Counsel for Plaintiff

22  S:\CasesSD\PETCO State\CPT00034215.doc

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT

## DECLARATION OF SERVICE BY UPS DELIVERY

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on August 28, 2006, declarant served by UPS, next day delivery, the CONSOLIDATED AMENDED COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of August, 2006, at San Diego, California.

LELA FULCHER



PETCO STATE
Service List - 8/28/2006    (06-0163)
Page 1 of 2

**Counsel For Defendant(s)**

Robert J. Blair
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA  92101-3375
  619/236-1234
  619/696-7419(Fax)

Richard M. Segal
Pillsbury Winthrop Shaw Pittman LLP
501 West Broadway, Suite 1100
San Diego, CA  92101
  619/234-5000
  619/236-1995(Fax)

Eric S. Waxman
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Ave., Suite 3400
Los Angeles, CA  90071
  213/687-5000
  213/687-5600(Fax)

**Counsel For Plaintiff(s)**

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
  615/244-2202
  615/252-3798(Fax)

William K. Cavanagh, Jr.
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL  62701
  217/544-1771
  217/544-9894(Fax)

Randall J. Baron
A. Rick Atwood
Stephen J. Oddo
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423(Fax)

Joe  Kendall
Willie C. Briscoe
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
  214/744-3000
  214/744-3015(Fax)

PETCO STATE

Service List - 8/28/2006    (06-0163)

Page 2 of 2

Brian J. Robbins
Caroline A. Schnurer
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101
   619/525-3990
   619/525-3991 (Fax)

SUM-100

# SUMMONS on Consolidated Amended Complaint
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* PETCO Animal Supplies, Inc.,
Additional Parties Attachment form is attached

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

2006 AUG 28 P 2: 55

SAN DIEGO COUNTY, CA

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
BILL J. HARRIS, On Behalf of Himself and All Others Similarly Situated

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* GIC 869399 |

Superior Court of California, County of San Diego
330 West Broadway
San Diego, CA 92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Randall J. Baron, Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 W. Broadway, Suite 1900, San Diego, CA 92101, 619/231-1058

DATE: AUG 2 8 2006        Clerk, by _____ E. SCHEITT _____, Deputy
*(Fecha)*              *(Secretario)*                        *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL] SUPERIOR COURT SAN DIEGO COUNTY, CA.

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. January 1, 2004] | Code of Civil Procedure §§ 412.20, 465 |

**SUMMONS**

www.accesslaw.com

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| In re PETCO Animal Supplies, Inc. S'holder Litig. | GIC 869399 |

INSTRUCTIONS FOR USE

➡ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➡ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party):*

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

~~PETCO ANIMAL SUPPLIES, INC.,~~ LEONARD GREEN & PARTNERS L.P., GREEN EQUITY INVESTORS IV, L.P., GEI CAPITAL IV, LLC, TEXAS PACIFIC GROUP, TPG PARTNERS V, L.P., TPG GENPAR V, L.P., TPG ADVISORS V, INC., ROVER HOLDINGS CORP., ROVER ACQUISITION CORP., BRIAN K. DEVINE, JOHN G. DANHAKL, JAMES M. MYERS, CHARLES W. DUDDLES, DAVID T. CHING, DAVID B. APPEL, SANDRA N. BANE, JULIAN C. DAY, PETER MASLEN and DOES 1-25, inclusive.

Page ___1___ of ___1___

Form Adopted by Rule 982(a)(9)(A)
Judicial Council of California
982(a)(9)(A) [New January 1, 1993]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

*www.accesslaw.com*



1    LERACH COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP
2    DARREN J. ROBBINS (168593)
     RANDALL J. BARON (150796)
3    655 West Broadway, Suite 1900
     San Diego, CA  92101
4    Telephone:  619/231-1058
     619/231-7423 (fax)
5
     PROVOST & UMPHREY LAW FIRM, LLP
6    JOE KENDALL
     WILLIE C. BRISCOE
7    3232 McKinney Avenue, Suite 700
     Dallas, TX  75204
8    Telephone:  214/744-3000
     214/744-3015 (fax)
9
     Attorneys for Plaintiff
10

11                SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                          COUNTY OF SAN DIEGO

13
     BILL J. HARRIS, On Behalf of Himself and  )   Case No.         869399
14   All Others Similarly Situated,            )
                                               )   CLASS ACTION
15                          Plaintiff,         )
                                               )   COMPLAINT BASED UPON SELF-
16           vs.                               )   DEALING AND BREACH OF FIDUCIARY
                                               )   DUTY
17   PETCO ANIMAL SUPPLIES, INC.,              )
     BRIAN K. DEVINE,                          )
18   JAMES M. MYERS,                           )
     JOHN G. DANHAKL,                          )
19   DAVID B. APPEL,                           )
     SANDRA N. BANE,                           )
20   DAVID T. CHING,                           )
     JULIAN C. DAY,                            )
21   PETER MASLEN,                             )
     CHARLES W. DUDDLES, and                   )
22   DOES 1-25, inclusive,                     )
                                               )
23                          Defendants.        )
                                               )
24

25

26

27

28

     ─────────────────────────────────────────────────────
            COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by plaintiff on behalf of the holders of PETCO Animal Supplies, Inc. ("PETCO" or the "Company") common stock against PETCO and its directors arising out of their attempts to provide certain PETCO insiders and directors with preferential treatment in connection with their efforts to complete the sale of PETCO to Leonard Green & Partners L.P. and Texas Pacific Group (the "Acquisition"). This action seeks equitable relief only.

2.      PETCO operates as a specialty retailer of pet food, supplies, and services. As of January 28, 2006, the Company operated 779 stores in 49 states and the District of Columbia. PETCO was founded in 1965 and is headquartered in San Diego, California.

3.      On July 14, 2006, PETCO revealed it had agreed to be acquired by two private equity groups for about $1.8 billion, including debt. Under the terms of the deal, Leonard Green & Partners, L.P. ("Leonard Green") and Texas Pacific Group ("Texas Pacific") – the same investors that took PETCO private in 2000 (then public two years later) – will pay $29 a share. The transaction is expected to close by 2007.[1]

4.      The Company's shares had fallen 48% in the past 19 months and, after the decline, Texas Pacific and Leonard Green formed a plan to reacquire the Company. Texas Pacific, based in Forth Worth, Texas, and Los Angeles-based Leonard Green, bought PETCO in October 2000 for $600 million. Within two years they sold most of it in an initial public offering ("IPO") that valued the Company at $1 billion. PETCO's market value more than doubled by the end of 2004.

5.      Collectively, Texas Pacific and Leonard Green own 1.8 million shares, of the Company's common stock, representing over 3% of the outstanding shares of the Company's common

---

[1]      UBS acted as financial adviser to PETCO and has rendered a fairness opinion to its independent committee. Pillsbury Winthrop Shaw Pittman LLP served as its legal counsel. Credit Suisse, Bank of America, Wells Fargo Bank, and mezzanine funds managed by Goldman Sachs & Co. provided commitments for the debt portion of the financing for the deal.

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1    stock, yet control the Company's Board and management as described *infra*.  Texas Pacific and

2    Leonard Green are collectively and individually referred to herein as the "Dominating Shareholders."

3        6.    The Dominating Shareholders sought to monetize their investment in PETCO at the

4    expense of the Company's minority shareholder. The Dominating Shareholders' monetization plan had

5    multiple steps.  First, the Dominating Shareholders took the Company private in 2000, acquiring 100%

6    of the Company's shares.  Then, in 2002, the Dominating Shareholders sold most of their shares vis-à-

7

8    vis an IPO and, by 2004, the Dominating Shareholders' remaining holdings had more than doubled

9    again.

10        7.    The Dominating Shareholders have used their control over the Company to generate

11   enormous profits using defective "fairness opinions," as they have no doubt will do here by re-

12   privatizing the Company and structuring the Company's retention of its financial advisor in a manner

13   that ensures that the Company's financial advisor will rubber-stamp the proposed Acquisition on the

14   terms they demand, as the fee paid for the "fairness opinion" is dependent upon whether the proposed

15   Acquisition is consummated. After taking the Company private in 2000 for $600 million – again using

16

17   a "fairness opinion" rubber-stamped by a financially incentivized financial advisor and with the aid of a

18   financially motivated (and conflicted Board of Directors) and the Company's top management – the

19   Dominating Shareholders brought the Company public in 2002 for $1 billion, despite a waning

20

21   economy and one of the worst IPO markets in nearly a decade.

22        8.    Furthermore, the $1 billion IPO, where the Dominating Shareholders pocketed $400

23   million in cash, involved the sale of *only some* of their Company holdings.  The Company's shares

24   between 2002 and 2004 more than doubled again, allowing the Dominating Shareholders to potentially

25   reap hundreds of millions more.  Then, in late 2004, the Dominating Shareholders began plans to re-

26   privatize the Company.  During the planning stages – over the past 19 months – the Company's shares

27   plummeted by 48%.  The 48% decline coincidentally would render the re-privatization (*i.e.*, the

28

- 2 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1  proposed Acquisition) even more profitable than had the Company's shares not declined under the

2  Dominating Shareholders' control.

3       9.      Further, the Dominating Shareholders insisted that defendants (and fellow management)

4  would have to assist the Dominating Shareholders in squeezing the minority shareholders out of their

5  interests in the Company for a discounted price.  The individual defendants are controlled by the

6  Dominating Shareholders and participated and benefited from the Dominating Shareholders' successful

7  2000 privatization of PETCO and the 2002 public offering, and stand to also benefit in the proposed

8  Acquisition.  At the Dominating Shareholders' request and in exchange for an undisclosed sum, the

9  individual defendants have agreed to participate in "Road Shows" whereby they will actively assist the

10  Dominating Shareholders in drumming up investors for the Company's financing of the $1.8 billion

11  transaction.

12

13      10.      The Dominating Shareholders, vis-à-vis the terms of the Acquisition, were assured they

14  would achieve their ultimate goal of acquisition by requiring PETCO to pay the Dominating

15  Shareholders $50 million *plus* expenses in the event the directors terminate the acquisition agreement.

16  In addition, the Dominating Shareholders were also given until January 2007 to actually fund the

17  sale/purchase of the Company.[2]

18

19      11.      Although the most recent financial results reflect only the Company's April 2006 results,

20  the defendants agreed to sell the Company on terms reflecting these stale results, but gave the

21  Dominating Shareholders until the Company's fiscal *fourth quarter* to actually pay for the shares. *The*

22  *Company's fourth quarter ends on January 29, 2007, essentially giving the Dominating*

23  *Shareholders seven months to pay for the Company's shares yet stripping the Company's*

24

25

26

27  [2]    The Company's fiscal fourth quarter ends on January 29, 2007.

28

- 3 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

*shareholders of the benefits of any and all growth in the Company's shares (not even interest is being paid) throughout the seven months.*

12. Given that the Company's shares recently declined (as described below) based on negative projections controlled by the Dominating Shareholders, these additional financial reporting periods and their contents would be highly material to the Company's shareholders and have an enormous material effect on the value of the Company's shares. Thus, in effect, at the expense of the minority shareholders (plaintiff and the other Class members), the Dominating Shareholders are buying the Company on terms which effectively amount to a long-term call option at an artificially depressed price. Defendants' conduct here is truly unprecedented and grossly undermines the interests of the public shareholders.

13. On May 24, 2006, the Company issued its report for its first quarter 2006 and issued negative projections for the Company's second quarter 2006, with EPS of $0.23-$0.25 versus the $0.30 consensus. This negative projection alone set the stage for the shares to tumble even further – declining *10%* in just two days.

14. In pursuing the unlawful plan to sell PETCO, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing.

15. Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's shareholders. Plaintiff, on behalf of the Class, seeks only to level the playing field and to ensure that if shareholders are to be ultimately stripped of their respective equity interests through the Acquisition, that the Acquisition is conducted in a manner that is not overtly improper, unfair and illegal.

- 4 -
COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over defendants because they conduct business in California and/or are citizens of California.  This action is not removable.

17.    (a)    Venue is proper in this Court because the conduct at issue took place and had an effect in this County.

(b)    PETCO's principal place of business is located at 9125 Rehco Road, San Diego, California and defendants Devine and Myers are residents and citizens of California.

## PARTIES

18.    Plaintiff Bill J. Harris is, and at all times relevant hereto was, a shareholder of PETCO.

19.    Defendant PETCO, a Delaware corporation, operates as a specialty retailer of pet food, supplies, and services.  As of January 28, 2006, the Company operated 779 stores in 49 states and the District of Columbia.

20.    Defendant Brian K. Devine ("Devine") has served as Chairman of the Board of the Company since January 1994.  He joined PETCO in August 1990 and served as President and Chief Executive Officer until March 2004.  Devine is controlled by the Dominating Shareholders and participated in and benefited from the Dominating Shareholders' successful 2000 privatization of PETCO and the 2002 public offering, and stands to also benefit in the proposed Acquisition.  At the Dominating Shareholders' request and in exchange for an undisclosed sum, Devine has agreed to participate in "Road Shows" whereby he will actively assist the Dominating Shareholders in drumming up investors for the Company's financing of the $1.8 billion transaction. Prior to joining the Company, Devine was President of Krause's Sofa Factory, a furniture retailer and manufacturer, from 1988 to 1989. From 1970 to 1988, Devine was employed by Toys "R" Us, a retailer of children's toys, in various executive positions, including Senior Vice President, Director of Stores, and Senior Vice President, Growth, Development and Operations.

- 5 -

21.     Defendant John G. Danhakl ("Danhakl") has served as a director of the Company since October 2000. Danhakl has served as a partner at Leonard Green (one of the Dominating Shareholders) since 1995 and was Managing Director at Donaldson, Lufkin & Jenrette Securities Corporation from 1990 to 1995. Danhakl was a Vice President at Drexel Burnham Lambert from 1985 to 1990. Danhakl also serves on the Boards of Directors of The Arden Group, Inc., Big 5 Sporting Goods, Inc., Diamond Auto Glass Works, Liberty Group Publishing, Leslie's Poolmart, Inc., VCA Antech, Inc. and on the Board of Managers of AsianMedia Group LLC.

22.     Defendant James M. Myers ("Myers") is Chief Executive Officer and a director of the Company. He joined PETCO in May 1990 and was named Chief Executive Officer in March 2004. From 1998 to 2004, Myers served as Executive Vice President and Chief Financial Officer of PETCO. From 1996 to 1998, he served as Senior Vice President, Finance and before that as Vice President, Finance and as Vice President and Controller. Myers is controlled by the Dominating Shareholders and participated in and benefited from the Dominating Shareholders' successful 2000 privatization of PETCO and the 2002 public offering, and stands to also benefit in the proposed Acquisition. At the Dominating Shareholders' request and in exchange for an undisclosed sum, Myers has agreed to participate in "Road Shows" whereby he will actively assist the Dominating Shareholders in drumming up investors for the Company's financing of the $1.8 billion transaction. From 1980 to 1990, Myers held various positions at the accounting firm of KPMG LLP, including Senior Audit Manager.

23.     Defendant Charles W. Duddles ("Duddles") has served as a director of the Company since March 2002. Duddles is controlled by the Dominating Shareholders and participated and benefited from the Dominating Shareholders' successful 2002 public offering, and stands to also benefit in the proposed Acquisition. At the Dominating Shareholders' request and in exchange for an undisclosed sum, Duddles has agreed to participate in "Road Shows" whereby he will actively assist the Dominating Shareholders in drumming up investors for the Company's financing of the $1.8 billion transaction.

24.     Defendant David T. Ching ("Ching") has served as a director of the Company since November 2005. Ching serves as Senior Vice President and Chief Information Officer for Safeway Inc. Prior to joining Safeway in 1994, Ching was General Manager-North America for British American

- 6 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1    Consulting Group, a software/consulting firm focusing on the distribution and retail industry. From

2    1979 to 1993, Ching was with Lucky Stores Inc., most recently as Senior Vice President of Information

3    Systems. From 1975 to 1979, Ching held information technology management positions at Bell Canada

4    and at Control Data Canada.

5          25.    Defendant David B. Appel ("Appel") has served as a director of the Company since

6    April 2004.  Appel serves as Chairman of Orange Glo International, a privately-held marketer of

7    cleaning and home care products.  Appel joined Orange Glo in 1999 as Chief Operating Officer, and

8    was named Chairman in 2001. Prior to Orange Glo International, Appel was a partner with Accenture

9    (formerly Andersen Consulting), serving retail and consumer goods companies for 17 years in San

10   Francisco, Paris and Tokyo.

11         26.    Defendant Sandra N. Bane ("Bane") has served as a director of the Company since April

12   2004. Bane is a retired audit partner from KPMG LLP, having served 24 years with the firm.  She is a

13   member of the American Institute of Certified Public Accountants and the California Society of CPAs.

14   Bane also serves on the Board of Directors of Big 5 Sporting Goods, Inc. and TransAmerica Premier

15   Funds.

16         27.    Defendant Julian C. Day ("Day") has served as a director of the Company since

17   November 2000.  Day is controlled by the Dominating Shareholders and participated and benefited

18   from the Dominating Shareholders' successful 2000 privatization of PETCO and the 2002 public

19   offering, and stands to also benefit in the proposed Acquisition. In March 2002, Day became the

20   President and Chief Operating Officer of Kmart Corporation, and in January 2003, became Chief

21   Executive Officer and a director of Kmart. In October 2004, Day gave up his executive responsibilities

22   at Kmart following the merger of Kmart and Sears and served as a director of Sears Holdings

23   Corporation until April 2006. From 1999 to 2000, Day was with Sears Roebuck, most recently as

24   Executive Vice President and Chief Operating Officer. From 1992 to 1998, Day was with Safeway Inc.,

25   where he became Executive Vice President and Chief Financial Officer.

26         28.    Defendant Peter Maslen ("Maslen") has served as a director since October 2005.  Maslen

27   is CEO of The HansonMaslen Group, LLC, a private investment, development and consulting firm.

28   From 1999 to 2003, Maslen served as President of Starbucks Coffee International. Prior to that, he was

- 7 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1   President of Tricon Restaurants Central Europe (now YUM! Brands, Inc.) and held executive leadership

2   positions at PepsiCo and Mars, Inc. internationally. Maslen also serves on the boards of Herbalife Ltd.

3   and a number of privately held companies.

4        29.    The true names and capacities of defendants sued herein under California Code of Civil

5   Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore

6   sues these defendants by such fictitious names. Plaintiff will seek to amend this Complaint and include

7   these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously

8   named defendants is responsible in some manner for the conduct alleged herein and for the injuries

9   suffered by the Class.

10        30.    The defendants named above in ¶¶20-28 are sometimes collectively referred to herein as

11   the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

13        31.    In accordance with their duties of loyalty, care and good faith, the Individual Defendants,

14   as directors and/or officers of PETCO, are obligated to refrain from:

16             (a)    participating in any transaction where the directors' or officers' loyalties are

17   divided;

18             (b)    participating in any transaction where the directors or officers receive or are

19   entitled to receive a personal financial benefit not equally shared by the public shareholders of the

20   corporation; and/or

21             (c)    unjustly enriching themselves at the expense or to the detriment of the public

22   shareholders.

24        32.    Plaintiff alleges herein that the Individual Defendants, separately and together, in

25   connection with the sale of PETCO, violated the fiduciary duties owed to plaintiff and the other public

26   shareholders of PETCO, including their duties of loyalty, good faith and independence, insofar as they

- 8 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1   stood on both sides of the transaction and engaged in self-dealing and obtained for themselves personal

2   benefits, including personal financial benefits, not shared equally by plaintiff or the Class.

3       33.     Because the Individual Defendants have breached their duties of loyalty, good faith and

4   independence in connection with the sale of PETCO, the burden of proving the inherent or entire

5   fairness of the Acquisition, including all aspects of its negotiation and structure, is placed upon the

6

7   Individual Defendants as a matter of law.

8                           **CLASS ACTION ALLEGATIONS**

9       34.     Plaintiff brings this action on his own behalf and as a class action pursuant to California

10  on behalf of all holders of PETCO stock who are being and will be harmed by defendants' actions

11  described below (the "Class"). Excluded from the Class are defendants herein and any person, firm,

12  trust, corporation or other entity related to or affiliated with any defendant.

13

14      35.     This action is properly maintainable as a class action.

15      36.     The Class is so numerous that joinder of all members is impracticable. According to

16  PETCO's Securities and Exchange Commission ("SEC") filings, there are more than 57 million shares

17  of PETCO common stock outstanding.

18      37.     There are questions of law and fact which are common to the Class and which

19  predominate over questions affecting any individual Class member. The common questions include,

20  *inter alia*, the following:

21          (a)     whether defendants have breached their fiduciary duties of undivided loyalty,

22

23  independence or due care with respect to plaintiff and the other members of the Class in connection

24  with the Acquisition;

25          (b)     whether the Individual Defendants are engaging in self-dealing in connection

26  with the Acquisition;

27

28

- 9 -
COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

(c)    whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of PETCO;

(d)    whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Acquisition, including the duties of good faith, diligence, candor and fair dealing;

(e)    whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(f)    whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

38.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

39.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

40.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

41.    Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

42.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

## BACKGROUND TO THE PROPOSED ACQUISITION

43.    PETCO, based in San Diego, California, operates as a specialty retailer of pet food, supplies, and services.  As of January 28, 2006, the Company operated 779 stores in 49 states and the District of Columbia.

44.    The Company is controlled by Texas Pacific and Leonard Green (collectively, the "Dominating Shareholders") through numerous affiliates.  The Dominating Shareholders sought to monetize their investment in and control over PETCO at the expense of the Company's minority shareholders.

45.    While the Dominating Shareholders control the Individual Defendants, they also positioned themselves to control the future of the Company vis-à-vis stock ownership and historic financial payments to top executives for assisting in the 2000 privatization and 2002 IPO.  The 2006-2007 *re*-privatization appears to be no different from the Dominating Shareholders' usual and previous actions/motivations.

46.    Not only have they influenced the Board of Directors to agree to the improper proposed Acquisition in terms of the ultimate consideration paid, but also on additional terms which are unconscionable at best.  The Dominating Shareholders have until January 2007 to actually consummate (pay for) the Company's shares.  This is highly material because the Company's most recent quarterly results accessible by the market are for April 2006, and yet the Dominating Shareholders have until the end of January 2007 to pay plaintiff and the Class for their shares.

47.    While the Company will issue multiple financial reports in the interim which would have otherwise sent the Company's shares trading well above $29, the Dominating Shareholders have ensured that no competing offers (above $29) will be forthcoming.  First, the Dominating Shareholders and defendants agreed to pay the Dominating Shareholders $50 million *plus* expenses in the event a third-party competing offer was received and accepted.  Second, to further *deter* even the prospect of a

- 11 -

competing offer, defendants have agreed to take all proposed press releases to the Dominating

Shareholders for their review and approval **before** distribution.

48.    Finally, the Dominating Shareholders have a long history of handsomely compensating

those who help them fulfill their goals and, pursuant to the Acquisition agreement, the Company's top

officers and directors have agreed to participate in "Road Shows" wherein the Company's own

management will make statements to potential investors regarding the financing of the Acquisition.

49.    Thus, the $29 per share Acquisition proposal was not even an offer, it was a demand, a

*fait accompli* at best.

50.    The defendants used their control and knowledge as a tool to enhance their own personal

goals. The Dominating Shareholders, vis-à-vis said control, were assured they would achieve their goal

of profit maximization in the acquisition of PETCO.  For example, on May 24, 2006, the Company,

under the control and influence of the Dominating Shareholders, issued its first quarter report for 2006

and issued negative projections for the Company's second quarter, with EPS of $0.23-$0.25 versus the

$0.30 consensus.  This negative projection set the stage for the shares to tumble even further – declining

*10%* in just two days.

### THE PROPOSED ACQUISITION

51.    On July 14, 2006, the Company issued a press release entitled "PETCO Animal

Supplies, Inc. to be Acquired by Texas Pacific Group and Leonard Green & Partners, L.P. for $29.00

per Share in Cash," which stated in part:

> PETCO Animal Supplies, Inc., a leading specialty retailer of premium pet food, supplies
> and services, announced today that it has entered into a definitive agreement to be
> acquired by two private equity investment firms, Leonard Green & Partners, L.P. and
> Texas Pacific Group, for $29.00 per share in cash. The total value of the transaction,
> including assumed debt, is approximately $1.8 billion.
>
> The Board of Directors of PETCO, on the recommendation of an Independent
> Committee of Directors, has approved the merger agreement and recommends that
> PETCO's stockholders adopt the agreement. The transaction, which is expected to close
> by the fourth quarter of 2006, is subject to approval by PETCO's stockholders, as well
> as other customary closing conditions, including the receipt of regulatory approvals.
> PETCO will file the merger agreement today with the Securities and Exchange

- 12 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

Commission. The merger agreement will also be posted in the Investor Relations section of PETCO's website at www.PETCO.com.

David B. Appel, the Chairman of the Independent Committee of Directors, said: "Consistent with its fiduciary obligations, and in consultation with its independent financial and legal advisors, PETCO's Board of Directors formed an Independent Committee of Directors to carefully review an expression of interest in acquiring PETCO, and to determine what course of action would be in the best interest of our stockholders. After extensive negotiations and careful consideration in conjunction with our independent advisors, the Independent Committee of PETCO's Board unanimously concluded that the agreement being announced today was in the best interest of all of our constituencies, and, most importantly, our stockholders."

In accordance with the merger agreement, the Company will conduct a market test for 20 business days concluding August 10, 2006.

James M. Myers, Chief Executive Officer, said, "This proposed transaction provides PETCO stockholders with an immediate cash premium for their investment in the company, based on the trading range of PETCO shares over the past several months. Upon completion of the transaction, PETCO will be a private company that will have greater flexibility to accomplish its long-term plans, which, we believe, will be favorable for the company's associates and suppliers and the customers we serve through more than 800 stores nationwide. Texas Pacific Group and Leonard Green & Partners have deep experience investing in the retail sector and we look forward to working closely with them as our partners as we continue to advance PETCO's position as a leading specialty retailer of premium pet food, supplies and services."

UBS is acting as financial advisor to PETCO in connection with the merger transaction and has rendered a fairness opinion to the Independent Committee of PETCO's Board of Directors. Pillsbury Winthrop Shaw Pittman LLP is serving as its legal counsel. Credit Suisse, Bank of America, N.A., Wells Fargo Bank, N.A. and mezzanine funds managed by Goldman, Sachs & Co. have provided commitments for the debt portion of the financing for the transaction, which are subject to customary conditions.

52.     The Company's most recent public results are for the period which ended in April 2006 and, thus, the Company's stock price reflects only the Company's April 2006 results. The Dominating Shareholders agreed to acquire the Company with the stock reflecting these stale results, and defendants gave the Dominating Shareholders until 2007 to actually pay for the shares – the equivalent of nearly three quarterly periods. Thus, in effect, at the expense of the minority shareholders (plaintiff and the Class members), the Dominating Shareholders are acquiring the Company on terms which effectively amount to a long-term call option at an artificially depressed price. Moreover, to ensure they will succeed, defendants are controlled by the Dominating Shareholders and participated in and benefited from the Dominating Shareholders' successful 2000 privatization of PETCO and the 2002 public

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1    offering, and stand to also benefit in the proposed Acquisition. At the Dominating Shareholders'

2    request and in exchange for an undisclosed sum, defendants have agreed to participate in "Road Shows"

3    whereby they will actively assist the Dominating Shareholders in drumming up investors for the

4    Company's financing of the $1.8 billion transaction. Accordingly, defendants' conduct here is

5    unprecedented and grossly undermines the interests of the public shareholders.

6

7                                            **SELF-DEALING**

8        53.    By reason of their positions with PETCO, the Individual Defendants are in possession of

9    non-public information concerning the financial condition and prospects of PETCO, and especially the

10   true value and expected increased future value of PETCO and its assets, which they have not disclosed

11   to PETCO's public shareholders. Moreover, despite their duty to maximize shareholder value, the

12   defendants have clear and material conflicts of interest and are acting to better their own interests at the

13   expense of PETCO's public shareholders.

14       54.    The proposed sale is wrongful, unfair and harmful to PETCO's public shareholders, and

15   represents an effort by defendants to aggrandize their own financial position and interests at the expense

16   of and to the detriment of Class members. The Acquisition is an attempt to deny plaintiff and the other

17   members of the Class their rights while usurping the same for the benefit of the Dominating

18   Shareholders on unfair terms.

19       55.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations

20   require:

21

22      •    Withdraw their consent to the sale of PETCO and allow the shares to trade freely –
             without impediments – and immediately mandate the disclosure of the Company's
23           second quarter 2006 projections, which ends July 30, 2006, and projections for the
             remainder of the fiscal year.[3]

24

25

26   _____

27   [3]    Ending January 2007.

28

- 14 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

- Act independently so that the interests of PETCO's public shareholders will be protected, including, but not limited to, the retention of truly independent advisors and/or the appointment of a truly independent Special Committee and require that any acquisition proposal be approved by a majority of the minority shareholders.

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of PETCO's public shareholders.

- Fully and fairly disclose all material information to the Company's shareholders.

56.     The Individual Defendants have also approved the Acquisition so that it transfers 100% of PETCO's revenues and profits to the Dominating Shareholders, thus all of PETCO's operations will now accrue to the benefit of the Dominating Shareholders.

## CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties

57.     Plaintiff repeats and realleges each allegation set forth herein.

58.     The defendants have violated fiduciary duties of care, loyalty, candor and independence owed under applicable law to the public shareholders of PETCO and have acted to put their personal interests ahead of the interests of PETCO's shareholders.

59.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of plaintiff and other members of the Class.

60.     The Individual Defendants have violated their fiduciary duties by entering into a transaction with the Dominating Shareholders without regard to the fairness of the transaction to PETCO's shareholders.  Defendant PETCO directly breached and/or aided and abetted the other defendants' breaches of fiduciary duties owed to plaintiff and the other holders of PETCO stock.

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

61.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of PETCO because, among other reasons:

(a)    they failed to make proper, timely disclosures to the Company's shareholders;

(b)    they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Acquisition; and

(c)    they are using the sale of the Company to aggrandize their own wealth upon completion of the sale.

62.    Because the Individual Defendants dominate and control the business and corporate affairs of PETCO, and are in possession of private corporate information concerning PETCO's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of PETCO which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits.

63.    By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

64.    As a result of the actions of defendants, plaintiff and the Class will suffer irreparable injury as a result of defendants' self-dealing.

65.    Unless enjoined by this Court, the defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the proposed Acquisition which will exclude the Class from its fair share of PETCO's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

66.     Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class and have breached and are breaching their fiduciary duties to the members of the Class.

67.     Unless the proposed Acquisition is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Acquisition terms, and will not supply to PETCO's shareholders sufficient information to enable them to cast informed votes on the proposed Acquisition and may consummate the proposed Acquisition, all to the irreparable harm of the members of the Class.

68.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands preliminary and permanent injunctive relief in his favor and in favor of the Class and against defendants as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Declaring and decreeing that the Acquisition agreement was entered into in breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

C.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders;

D.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of PETCO's shareholders;

E.      Rescinding, to the extent already implemented, the Acquisition and proposals, voting agreements and termination fees associated therewith;

- 17 -

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

1        F.      Awarding plaintiff the costs and disbursements of this action, including reasonable

2    attorneys' and experts' fees; and

3        G.      Granting such other and further equitable relief as this Court may deem just and proper.

4    DATED: July 19, 2006                          LERACH COUGHLIN STOIA GELLER
5                                                     RUDMAN & ROBBINS LLP
                                                    DARREN J. ROBBINS
6                                                   RANDALL J. BARON

7

8                                                   _____
                                                              DARREN J. ROBBINS
9

10                                                  655 West Broadway, Suite 1900
                                                    San Diego, CA 92101
11                                                  Telephone: 619/231-1058
                                                    619/231-7423 (fax)

12                                                  PROVOST & UMPHREY LAW FIRM, LLP
                                                    JOE KENDALL
13                                                  WILLIE C. BRISCOE
                                                    3232 McKinney Avenue, Suite 700
14                                                  Dallas, TX 75204
                                                    Telephone: 214/744-3000
15                                                  214/744-3015 (fax)

16                                                  Attorneys for Plaintiff

17    S:\CptDraft\Deal\Cpt Petco.doc

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

PETCO Animal Supplies, Inc., Brian K. Devine, James M. Myers, John
G. Danhakl, David B. Appel, Sandra N. Bane, David T. Ching, Julian C.
Day, Peter Maslen, Charles W. Duddles and Does 1-25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

BILL J. HARRIS, On Behalf of Himself and All Others Similarly
Situated

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

FILED
OFFICE 7
CENTRAL DIVISION

2006 JUL 19 P 3:17

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a
copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the
court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more
information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse
nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may
lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an
attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services
program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California
Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito
en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por
escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted
pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de
California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no
puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta
su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un
servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios
legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de
California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California,
(www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of San Diego
330 West Broadway
San Diego, CA 92101

**CASE NUMBER:**
*(Número del Caso):*
GIC 869399

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Darren J. Robbins        Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900, San Diego, CA 92101        619/231-1058

DATE:       JUL 1 9 2006                          Clerk, by _____, Deputy
*(Fecha)*                                          *(Secretario)*        C. Spies        *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.    www.USCourtForms.com

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Darren J. Robbins (168593)<br>Lerach Coughlin Stoia Geller Rudman & Robbins LLP<br>655 West Broadway, Suite 1900, San Diego, CA 92101<br>TELEPHONE NO.: 619/231-1058    FAX NO.: 619/231-7423<br>ATTORNEY FOR (Name): Plaintiff Bill J. Harris | FILED<br>CIVIL BUSINESS OFFICE 7<br>CENTRAL DIVISION<br><br>2006 JUL 19 P 3: 16<br><br>CLERK-SUPERIOR COURT<br>SAN DIEGO COUNTY, CA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME:

CASE NAME:
Harris v. PETCO Animal Supplies, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | GIC 869399<br>JUDGE:<br>DEPT: |

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [✓] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [✓] is [ ] is not    complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve        in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. [ ] monetary    b. [✓] nonmonetary; declaratory or injunctive relief    c. [ ] punitive

4. Number of causes of action (specify): One

5. This case [✓] is [ ] is not    a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: July 19, 2006

Darren J. Robbins
(TYPE OR PRINT NAME)    ▶ _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2006] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 201.8, 1800–1812;<br>Standards of Judicial Administration, § 19<br>www.courtinfo.ca.gov<br>American LegalNet, Inc.<br>www.USCourtForms.com |


# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

## To Plaintiffs and Others Filing First Papers

If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 5 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 201.8(c) and 227 of the California Rules of Court.

## To Parties in Complex Cases

In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 1800 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property Damage/Wrongful Death
  Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business Practice (07)
  Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel) (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
  Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 1800–1812)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late Claim
    Other Civil Petition

1  LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2  DARREN J. ROBBINS (168593)
   RANDALL J. BARON (150796)
3  A. RICK ATWOOD, JR. (156529)
   STEPHEN J. ODDO (174828)
4  DAVID T. WISSBROECKER (243867)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)

7  ROBBINS UMEDA & FINK, LLP
   BRIAN J. ROBBINS (190264)
8  CAROLINE A. SCHNURER (206088)
   610 West Ash Street, Suite 1800
9  San Diego, CA  92101
   Telephone:  619/525-3990
10 619/525-3991 (fax)

11 Co-Lead Counsel for Plaintiff

12                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                              COUNTY OF SAN DIEGO

14 In re PETCO ANIMAL SUPPLIES, INC.   )   Lead Case No. GIC 869399
   SHAREHOLDER LITIGATION              )
15 _____    )   CLASS ACTION
                                       )
16 This Document Relates To:          )   MEMORANDUM OF POINTS AND
                                       )   AUTHORITIES IN SUPPORT OF
17     ALL ACTIONS.                    )   PLAINTIFF'S MOTION TO COMPEL
                                       )   DEFENDANT PETCO ANIMAL SUPPLIES,
18 _____    )   INC. TO PRODUCE RELEVANT
                                       )   DOCUMENTS
19
                                           DATE:     To Be Determined
20                                         TIME:     To Be Determined
                                           DEPT:     61
21                                         DATE ACTION FILED 07/19/06

22

23

24

25

26

27

28

F  I  L  E  D
Clerk of the Superior Court

SEP 1 3 2006

By: M. SPIESMAN, Deputy

SEP 2 9 2006

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 2 |
| III. | THE DISCOVERY SOUGHT BY PLAINTIFF | 4 |
| IV. | ARGUMENT | 5 |
| | A. Legal Standards on a Motion to Compel | 5 |
| | B. Defendants Have Impliedly Waived their Claim to Attorney-Client and/or Work-Product Privilege | 6 |
| V. | CONCLUSION | 11 |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1

# TABLE OF AUTHORITIES

2

**Page**

3   *Aetna Casualty & Surety Co. v. Superior Court,*
        153 Cal. App. 3d 467 (1984) ...................................................................... 8
4

    *Associated Brewers Distrib. Co. v. Superior Court,*
5        65 Cal. 2d 583 (1967) ............................................................................... 5

6   *Beesley v. Superior Court,*
        58 Cal. 2d 205 (1962) ............................................................................... 5
7

    *Colonial Life & Accident Ins. Co. v. Superior Court,*
8        31 Cal. 3d 785 (1982) ............................................................................... 6

9   *Columbia Broad. Sys., Inc. v. Superior Court,*
        263 Cal. App. 2d 12 (1968) ...................................................................... 5
10

    *Estate of Kime,*
11       144 Cal. App. 3d 246 (1983) .................................................................... 7

12  *Gonzalez v. Superior Court,*
        33 Cal. App. 4th 1539 (1995) ................................................................... 5
13

    *Handcards, Inc. v. Johnson & Johnson,*
14       413 F. Supp. 926 (N.D. Cal. 1976) ........................................................... 7

15  *Merritt v. Superior Court,*
        9 Cal. App. 3d 721 (1970) ............................................................. 2, 5, 7, 8
16

    *Mitchell v. Superior Court,*
17       37 Cal. 3d 591 (1984) ................................................................... 6, 7, 8, 9

18  *Oakland Raiders v. National Football League,*
        93 Cal. App. 4th 572 (2001) ..................................................................... 9
19

    *Pac. Tel. & Tel. Co. v. Superior Court,*
20       2 Cal. 3d 161 (1970) ................................................................................. 5

21  *Sealy Mattress Co. v. Sealy Inc.,*
        No. 8853, 1987 Del. Ch. LEXIS 451
22       (Del. Ch. June 19, 1987) .......................................................................... 10

23  *Southern California Gas Co. v. Public Utilities Comm'n,*
        50 Cal. 3d 31 (1990) ......................................................................... 5, 6, 7
24

    *Transamerica Title Ins. Co. v. Superior Court,*
25       188 Cal. App. 3d 1047 (1987) .................................................................. 7

26  *Volkswagenwerk Aktiengesellschaft v. Superior Court,*
        123 Cal. App. 3d 840 (1981) .................................................................... 5
27

    *Wellpoint Health Networks, Inc. v. Superior Court,*
28       59 Cal. App. 4th 110 (1997) .................................................................. 2, 9

- ii -

**Page**

*Zirn v. VLI Corp,*
    621 A.2d 773 (Del. 1993) .................................................................................................... 9

**STATUTES, RULES AND REGULATIONS**

California Evidence Code
    §954 ............................................................................................................................................ 6

California Code of Civil Procedure
    §2031.030 .................................................................................................................................. 4
    §2031.310 .................................................................................................................................. 2
    §2031.310(b)(2) ................................................................................................................. 5, 6, 7

**SECONDARY AUTHORITIES**

*California Practice Guide: Civil Procedure Before Trial*
    (TRG 2006) ............................................................................................................................ 5, 6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1    **I.      INTRODUCTION**

2         This is a shareholder action brought by plaintiff on behalf of the public shareholders of PETCO

3    Animal Supplies, Inc. ("PETCO" or the "Company"), arising out of the efforts of PETCO and its Board

4    of Directors (the "Board" or the "Individual Defendants"), to sell PETCO to Company insiders Leonard

5    Green & Partners L.P. ("Leonard Green"), and the Texas Pacific Group ("TPG") (collectively the

6    "Buyout Group"), via an unfair process and at a price that undervalues the holdings of the Company's

7    public shareholders (the "Proposed Acquisition"). ¶1.[1]

8         The Board agreed to sell the Company to the Buyout Group despite the fact that another

9    potential acquirer, industry competitor PetSmart, Inc. ("PetSmart"), had offered to pay $4 more per

10   share for the Company. ¶¶2, 91-95. The Board's motivation for doing so is to secure personal material

11   benefits for themselves and other Company insiders, benefits which include continuing employment for

12   defendants Brian K. Devine ("Devine"), the Board's Chairman, and James M. Myers ("Myers"), the

13   Company's Chief Executive Officer ("CEO"). ¶¶5, 7. The Board's proffered justification to

14   shareholders for rebuffing the PetSmart bid, however, is that, in the Board's view, a merger between

15   PETCO and PetSmart cannot be consummated because of supposed antitrust concerns. ¶¶4, 72-95.

16   Defendants in this action have stated their intention to not only espouse this view to the Company

17   shareholders, but to defend this action on the same basis.

18         Defendants are wholly unwilling to lay their cards on the table. Despite taking the position –

19   both in public filings wherein they have urged shareholders to vote to approve the Proposed

20   Acquisition, and in response to plaintiff's discovery requests made in connection with this litigation –

21   that the potential antitrust risks were sufficient to justify rejecting the PetSmart bid, defendants have

22   refused to produce any evidence that such concerns were real and not imagined. Defendants are thereby

23   using the attorney-client/work-product privilege as both a sword and shield. Under California law,

24   however, "defendant[s] cannot have it both ways. If [they] choose[] [to put the adequacy of advice of

25   counsel at issue, they] do[] so with the understanding that the attorney-client privilege and the work

26   _____

27   [1]    All "¶" and "¶¶" references are to plaintiff's Consolidated Amended Complaint Based Upon Self-Dealing and Breach of Fiduciary Duty ("Complaint").

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1    product doctrine are thereby waived." *Wellpoint Health Networks, Inc. v. Superior Court*, 59 Cal. App.

2    4th 110, 128 (1997).

3        Through this motion, in accordance with California Code of Civil Procedure ("C.C.P.")

4    §2031.310, plaintiff seeks to compel the discovery of information from defendant PETCO relating to

5    the Board's proffered antitrust rationale for refusing to accept the PetSmart bid. The discovery sought

6    is not only directly relevant to plaintiff's claims, but is also essential for plaintiff to establish that

7    defendants' reliance on supposed antitrust concerns is an unsupportable position, and that their decision

8    to reject the superior PetSmart proposal was a breach of their fiduciary duty to maximize shareholder

9    value in connection with the sales process. Because there is no alternative source of this information, it

10    is vital information to plaintiff and must be produced in the interest of fundamental fairness. *See*

11    *Merritt v. Superior Court*, 9 Cal. App. 3d 721, 730 (1970).

12    **II.    FACTUAL BACKGROUND**

13        The Buyout Group has had a long and prosperous relationship with PETCO and its Board. The

14    Buyout Group used to own PETCO, having taken the Company private in 2000, and then public again

15    in 2002. ¶¶52-54. In the process, the Buyout Group made over $1 billion. ¶54. Numerous Board

16    members shared in this profit – no less than seven of the nine PETCO directors currently on the Board

17    were employed by the Buyout Group during its previous ownership of the Company, which continued

18    through October 2004 when the Buyout Group sold its remaining 6.95 million PETCO shares in a

19    public offering for $35.60 a share. *Id.*

20        It is no surprise at all that the Buyout Group came knocking again on March 25, 2006, and

21    offered to once again purchase the Company on the cheap. ¶¶56-65. It is also not surprising that the

22    Board, which is inextricably entangled financially and professionally with the Buyout Group, bent over

23    backwards to sell the Company to the Buyout Group on terms preferential to the Buyout Group and

24    detrimental to the Company's public shareholders. ¶¶62-67.

25        PetSmart, however, entered the scene. PetSmart approached the sham "special committee"

26    defendants had set up to engineer the sale to the Buyout Group on April 17, 2006, and offered to buy

27    the Company for $30 to $32 a share, or $5.50 a share more than what the Buyout Group had initially

28    proposed. ¶70. What ensued next was a classic game of "hide the ball," with defendants doing all they

- 2 -

1    could to keep PetSmart out of the mix and ensure the sale of the Company to the Buyout Group.  ¶¶75-

2    94.

3            The primary roadblock defendants set up to derail PetSmart's bid was a supposed concern that a

4    PETCO/PetSmart merger could not be consummated because of potential antitrust issues identified by

5    their legal counsel.  ¶¶72, 73.  Although PetSmart did not agree with the assessment of defendants'

6    counsel – it even went so far as to have its own advisors make a presentation to the Board that

7    demonstrated any risk of antitrust obstacles was slight – PetSmart attempted to overcome this roadblock

8    by including in its offer various financial incentives to the company's shareholders designed to mitigate

9    any risk that antitrust scrutiny or governmental investigation could delay or derail a merger.  ¶81.

10   Along with a $33 per share bid, PetSmart offered: (i) a lump-sum payment of $200 million in the event

11   a transaction failed to close due to antitrust concerns (the "reverse termination" fee); (ii) a "ticking fee"

12   intended to increase the per share price 6% per annum if the transaction failed to close within six

13   months of a signed merger agreement between the parties; and (iii) $10 million for PETCO to use for

14   workforce retention while the transaction was awaiting antitrust approval.  ¶91.  Under the terms

15   proposed by PetSmart, even if the merger failed to close due to antitrust scrutiny – a nonexistent

16   concern given the lack of market concentration in the pet products industry[2] – shareholders would have

17   benefited from payment of the $200 million reverse termination fee, which equates to approximately

18   $3.50 per share.  See id.; ¶¶3, 112.  And if the deal did close, shareholders would have received an

19   additional $4 per share more than the Buyout Group eventually offered.  Thus, the PetSmart offer was a

20   "win-win" scenario for PETCO's public shareholders.

21           Despite the overwhelmingly superior benefits to shareholders promised by the PetSmart bid,

22   defendants maintained their steadfast refusal to consider the proposed merger in good faith and instead

23   rejected the PetSmart offer out-of-hand.  In doing so, they claimed that, notwithstanding PetSmart's

24   offer to structure the transaction in order to eliminate any and all transaction risk, the risk of delay or

25   _____

26   [2]     See ¶¶57-58.  The proposed combination of PETCO and PetSmart would have resulted in a
     collective market share of only 15-17% in the nationwide market for pet care products, which would
27   likely be far below the FTC threshold for intervention.  See U.S. Dep't of Justice and the Fed. Trade
     Comm'n, Horizontal Merger Guidelines, Rev. Apr. 8, 1997.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1   governmental intercession due to purported antitrust concerns posed by a PETCO/PetSmart merger was
2   too great. ¶¶4, 85. They reached this conclusion despite the fact that the two companies combined have
3   only a 15-17% share of the market for pet products. *See id.*

4       Defendants instead accepted a much lower bid from the Buyout Group in order to guarantee
5   themselves insider benefits. ¶¶4-5, 95-96. These benefits include continuing employment for Devine,
6   Myers and other Company insiders, and the promise that they would share in the Buyout Group's
7   profits as they did when the Buyout Group took the Company private and then public again in 2000-
8   2004. ¶¶5-7, 99-104. In doing so, defendants breached their duty to maximize shareholder value so
9   that they could serve their own interests instead.

10  **III.    THE DISCOVERY SOUGHT BY PLAINTIFF**

11      On August 7, 2006, plaintiff served his First Request for Production of Documents to
12  Defendants PETCO Animal Supplies, Inc., James M. Myers, Brian K. Devine and John G. Danhakl
13  ("Request") consisting of 35 requests. *See* Wissbroecker Decl., Ex. A.[3] Pursuant to C.C.P. §2031.030,
14  defendants had until September 8, 2006, to produce the documents requested. On September 8, 2006,
15  PETCO served its response to plaintiff's Request ("PETCO's Response"). In PETCO's Response,
16  defendant PETCO stated that they are refusing to produce any privileged documents responsive to the
17  requests made by plaintiff that call for information relating to defendants' assessment of potential
18  antitrust risks in a PETCO/PetSmart Merger. For example, defendant PETCO refused to produce
19  documents they regard as privileged in response to plaintiff's request for "all documents reviewed by
20  the Individual Defendants or reviewed by any officer, executive or financial advisor of PETCO
21  concerning any Offer (including, without limitation, the Proposed Acquisition) or any efforts which
22  could result in an offer."[4]  *See* plaintiffs Request No. 3; PETCO's Response to Request No. 3

23  _____

24  [3]    Declaration of David T. Wissbroecker in Support of Plaintiff's Motion to Compel Defendant
25  PETCO Animal Supplies, Inc. to Produce Relevant Documents ("Wissbroecker Decl."), filed
    concurrently herewith.

26  [4]    Defendant PETCO also cited attorney-client and/or work-product privilege as its reason for
27  withholding documents responsive to plaintiff's Request Nos. 2, 3, 5, 12, 13 and 17. The information
    sought by these requests also relates to defendants' assessment of antitrust risk.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1    (Wissbroecker Decl., Exs. A-B). PETCO reiterated its refusal to produce documents during a meet and

2    confer initiated by plaintiff's counsel in compliance with C.C.P. §2031.310(b)(2), and held September

3    11, 2006. Wissbroecker Decl., ¶2. Specifically, PETCO informed plaintiff that it will not produce any

4    information concerning the advice solicited and given by counsel to the Board regarding the antitrust

5    implications of PetSmart's proposed merger with PETCO. *Id.*

6         As set forth below, the Company's arguments for withholding information are without merit

7    given its implied waiver of attorney-client and work-product privilege by placing at issue PETCO's and

8    its Board's reliance on the advice of counsel regarding antitrust reasons for rejecting PetSmart's bid.

9    *See, e.g., Southern California Gas Co. v. Public Utilities Comm'n*, 50 Cal. 3d 31, 40 (1990); *Merritt*, 9

10   Cal. App. 3d 721. Thus, all responsive information should be turned over to plaintiff immediately.

11   **IV.    ARGUMENT**

12        **A.    Legal Standards on a Motion to Compel**

13        C.C.P. §2031.310(b)(1) provides that if a party demanding the production of documents deems

14   that an objection to production is without merit or too general, that party may move for an order

15   compelling production. The party requesting compliance need only demonstrate "good cause" to justify

16   an order compelling further responses. C.C.P. §2031.310(b)(1). "Good cause" is established by

17   demonstrating that the information sought through discovery is relevant to the subject matter of the

18   action, and that specific facts justify discovery. Robert I. Weil & Ira A. Brown, Jr., *California Practice*

19   *Guide: Civil Procedure Before Trial* ¶8:1495.6, at 8H-33 (TRG 2006).[5]  Factors to be considered

20   include the relationship of the information sought to the issues framed in the pleadings, the likelihood

21   that disclosure will be of practical benefit to the party seeking discovery, and the burden in furnishing

22   the information sought. Weil & Brown, *supra*, ¶8:1180, at 8F-72; *Columbia Broad. Sys., Inc. v.*

23   *Superior Court*, 263 Cal. App. 2d 12, 19 (1968).[6]  This standard is to be applied liberally. *Pac. Tel. &*

24

25   _____

26   [5]      *Volkswagenwerk Aktiengesellschaft v. Superior Court*, 123 Cal. App. 3d 840 (1981).

27   [6]      *Gonzalez v. Superior Court*, 33 Cal. App. 4th 1539, 1546 (1995); *see also Associated Brewers Distrib. Co. v. Superior Court*, 65 Cal. 2d 583, 587-88 (1967) (good cause includes relevance of the subject matter, necessity for trial preparation and/or prevention of surprise at trial); *Beesley v. Superior*

28

- 5 -

1    *Tel. Co. v. Superior Court*, 2 Cal. 3d 161, 172 (1970).  Weil & Brown, *supra*, ¶8:71, at 8C-3.

2    Discovery extends to any information that might reasonably lead to other admissible evidence.  *See*

3    C.C.P. §2017.010.  Any doubts as to relevancy are to be resolved in favor of permitting discovery,

4    particularly where the precise issues in the case are not clearly established.  *Colonial Life & Accident*

5    *Ins. Co. v. Superior Court*, 31 Cal. 3d 785, 790 (1982).

6         Plaintiff has good cause for requesting the discovery sought.  The requested information is

7    directly relevant to the issues in the lawsuit and is reasonably particularized.  In addition, although

8    perhaps otherwise privileged, information relating to PETCO's proffered advice of counsel justification

9    for rejecting PetSmart's offer on antitrust grounds is subject to an implied waiver and therefore is

10   discoverable and would be admissible at trial.

11        **B.     Defendants Have Impliedly Waived their Claim to Attorney-Client**
              **and/or Work-Product Privilege**
12

13        As a general matter, information that is privileged may be withheld in response to a discovery

14   request.  *See id.*; Cal. Evid. Code §954 (stating that a party may "refuse to disclose, and to prevent

     another from disclosing, a confidential communication between client and lawyer").  However, where
15
     privilege has been waived, either by express or implied waiver, the privilege ceases to operate and the
16
     information becomes discoverable.  *See, e.g., Southern California Gas*, 50 Cal. 3d at 40; *accord*
17
     *Mitchell v. Superior Court*, 37 Cal. 3d 591, 605 (1984).[7]
18
          Under settled California law, an implied waiver of the attorney-client and/or work-product
19
     occurs when "the [defendant] has put the otherwise privileged communication directly at issue and that
20
     disclosure *is essential for a fair adjudication of the action*."  *Southern California Gas*, 50 Cal. 3d at 40
21
     (citing *Mitchell*, 37 Cal. 3d at 609).  Said differently, once a defendant demonstrates an intention to rely
22

23   _____

24   *Court*, 58 Cal. 2d 205, 208-09 (1962) (the ascertainment of the truth, elimination of surprise and good
     cause includes, *inter alia*, preparation for examination and cross examination of potential witnesses).
25
     [7]   Although the "'Evidence Code does *not* create any exception to the lawyer-client privilege for
26   the situation in which a client *tenders* an issue such as his lawyer's conduct or state of mind. . . . the
     Code does *not* bar the courts from creating by decisional law *new* exceptions to various privileges.'"
27   *Southern California Gas*, 50 Cal. 3d at 40 (citing *Chicago Title Ins. Co. v. Superior Court*, 174 Cal.
     App. 3d 1142, 1149 n.8 (1985)) (emphasis in original).
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1  on the advice of counsel as a defense to an action, fundamental fairness requires a finding that the

2  defendant has "waive[d] the attorney-client privilege as to communications and documents relating to

3  the advice." *Transamerica Title Ins. Co. v. Superior Court*, 188 Cal. App. 3d 1047, 1053 (1987) (citing

4  *Handcards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929 (N.D. Cal. 1976)). Such is the case here.

5      First, defendants have "deliberate[ly] inject[ed] the advice of counsel" into the proceedings.

6  *Southern California Gas*, 50 Cal. 3d at 43. Defendants made clear in the Proxy that they are citing

7  purported antitrust concerns identified by their attorneys in an attempt to justify their refusal to accept

8  the superior bid offered by PetSmart. For example, defendants explained in the Proxy that potential

9  antitrust risks such as "a requirement, as part of any such transaction, that the combined business be

10 restructured" were crucial to their decision to reject PetSmart's offer of $33 per share (as opposed to the

11 $29 per share price which was eventually accepted). ¶¶4, 5, 91, 95. Moreover, the Proxy is replete with

12 examples of the special committee and the rest of the Board citing the advice of counsel regarding the

13 alleged regulatory antitrust implications of a merger with PetSmart as one of the primary reasons they

14 chose to accept a bid that was a full $4 per share less than PetSmart's offer. In addition, in a meet and

15 confer conference held pursuant to C.C.P. §2031.310(b)(2), counsel for defendant PETCO expressly

16 stated that they intend to rely on the advice of counsel regarding the antitrust implications surrounding

17 the proposed merger with PetSmart as a defense to the plaintiff's claim that they breached their

18 fiduciary duty to shareholders by dismissing and rejecting PetSmart's merger proposal. Wissbroecker

19 Decl., ¶2. Accordingly, the "decisions, conclusions, and mental state of the attorney[s]" who advised

20 the Board have been placed squarely at issue in this litigation by defendants, thus evincing an implied

21 waiver on the part of the defendants as to documents and communications concerning the antitrust

22 implications of the proposed merger with PetSmart. *See Mitchell*, 37 Cal. 3d at 605 (citing *Estate of*

23 *Kime*, 144 Cal. App. 3d 246, 259 (1983)) (original emphasis omitted).

24     In *Merritt*, where the court found an implied waiver of the attorney-client privilege and

25 compelled production of documents when the advice an insurance company received from its counsel

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1  was at issue in a personal injury case, is on point.[8]  *Merritt*, 9 Cal. App. 3d 721.  In *Merritt*, the

2  petitioner sought production of certain communications between an insurance company's lawyer and

3  the company's administrator of the company's workman's compensation policy, in order to assess the

4  impact of a workman's compensation lien on the insurance company's decision not to attempt to settle a

5  personal injury suit within the limits of the petitioner's policy based upon advice of that counsel.  *Id.* at

6  723-24.  The insurance company refused to produce the documents, claiming that the communications

7  were privileged.  *Id.* at 724.  The trial court granted a motion to compel and the Court of Appeals

8  affirmed, holding that both the attorney-client and work-product privilege had been waived.  *Id.* at 730.

9  The court reasoned that an implied waiver had occurred because "the theory of plaintiff's lawsuit placed

10  in issue the conduct and state of mind of his personal injury counsel in failing to propose a settlement."

11  *Id.*  In similar fashion here, the Board's counsel's state of mind and conduct are squarely at issue, for

12  without knowing what the attorneys told PETCO's Board, there is no way for plaintiffs, or the Court for

13  that matter, to determine whether the Board's proffered antitrust reason for refusing to negotiate in good

14  faith with PetSmart has a basis in fact.

15      Moreover, defendants must disclose the information and communications between the Board

16  and its legal advisors regarding the antitrust implications of a merger with PetSmart in order to ensure

17  _____

18  [8]    The California cases that have declined to find an implied waiver are not applicable on their
facts. For example, in *Mitchell*, the court refused to find an implied waiver where the defendants sought

19  to discover evidence of concerning the reasonableness or genuineness of the plaintiff's fears based on
her attorney's advice about chemical contamination, which formed the basis for a claim of injuries

20  stemming from emotional distress.  37 Cal. 3d at 595-98.  The Court concluded that the
communications from the plaintiff's lawyer were not squarely at issue.  *Id.* at 604.  Rather it was the

21  reasonableness and objective nature of her fears about the chemical alone that were pertinent, regardless
of whether she gained the relevant information or misinformation about the chemical from her lawyers

22  or not.  *Id.* at 608. ***Under the circumstances, the privileged communications represented only "one of
several forms of indirect evidence in the matter,"*** thus it was not necessary to find an implied waiver of

23  the communications to ensure a fair adjudication of the case.  *Id.* at 606.  There were, unlike here, other
avenues by which to evaluate the reasonableness of the plaintiff's claims of emotional distress.  *See id.*

24  at 608.  Likewise, in *Aetna Casualty & Surety Co. v. Superior Court*, the court held that there was no
implied waiver because , whether or not the defendant insurance company received advice from counsel

25  regarding the denial of a claim, such advice was separate from the question of whether the denial was
objectively reasonable based on the underlying facts that were available in this litigation. 153 Cal. App.

26  3d 467, 476-78 (1984).  Here, by contrast, there is no way for the Court or plaintiff's to evaluate
defendants' decision making processes without reviewing the advice PETCO was given by its legal

27  advisors regarding the possible antitrust implications of a merger with PetSmart.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1    "a fair adjudication of" the action.   *Mitchell*, 37 Cal. 3d at 609.   The information and/or

2    communications must be made available so that plaintiff and the Court can evaluate whether defendants

3    breached their fiduciary duty to shareholders by failing to maximize shareholder value.  Without access

4    to information shared with the Board by its legal advisors regarding any anticipated antitrust

5    implications of the proposed merger, the Court would have no concrete evidence to use in determining

6    whether defendant's proffered reason for rejecting PetSmart's offer in favor of a lower offer from the

7    Buyout Group was pretextual or not.   It is vital, both to the plaintiff's case, and to the Court's

8    adjudication of this matter, that PETCO turn over all information concerning its rejection of the

9    PetSmart bid, including documents and/or communications from their legal counsel concerning the

10   antitrust implications of the proposed merger.  There is no other source for this information.

11        Importantly, the Board had the opportunity to solicit advice from non-privileged sources

12   regarding the antitrust implications of a proposed merger with PetSmart, just as they did when they

13   sought financial advice, but decided instead to rely entirely on the advice of their legal counsel.

14   Accordingly, fundamental notions of fairness require that implied waiver attach, for there is no other

15   avenue by which to evaluate the Board's decision-making process with respect to the proffered antitrust

16   rationale for rejecting PetSmart's bid.  Any privilege that may exist with respect to these documents

17   has, as set forth above, been impliedly waived.  As was stated by the court in *Wellpoint*: "The defendant

18   cannot have it both ways.  If it chooses [to put the adequacy of advice of counsel at issue], it does so

19   with the understanding that the attorney-client privilege and the work product doctrine are thereby

20   waived." 59 Cal. App. 4th at 128.

21        Delaware courts, which routinely handle cases involving mergers and acquisitions such as the

22   case at bar, have considered nearly the identical set of circumstances as are present here and have found

23   it fundamentally unfair to shield otherwise privileged information.[9]  In *Zirn v. VLI Corp.*, for example,

24   the Supreme Court of Delaware held that a corporation had executed an implied waiver when it relied

25

26   [9]    *Oakland Raiders v. National Football League*, 93 Cal. App. 4th 572, 586 n.5 (2001) (stating that

27   a California court "may properly rely on corporate law developed in the State of Delaware given that it
     is identical to California corporate law for all practical purposes").

28

- 9 -

1  on advice of patent counsel regarding the reinstatement of a lapsed patent *as a justification for*

2  *accepting a lower bid for the company*. 621 A.2d 773, 775-78 (Del. 1993). The Court held that while

3  the attorney-client and work-product privileges ordinarily apply to communications between a board of

4  directors and its counsel, that privilege was waived where the defendants had "partially disclosed" the

5  substance of the privileged communications, *e.g.*, that counsel's advice supported the board's

6  conclusion that the patent would not be reinstated and that a lower price per share was warranted. *Id.* at

7  781. In so holding, the court explained that:

8      The purpose underlying the rule of partial disclosure is one of fairness to discourage the
       use of the privilege as a litigation weapon in the interest of fairness. *A party should not*
9      *be permitted to assert the privilege to prevent inquiry by an opposing party where the*
       *professional advice, itself, is tendered as a defense or explanation for disputed*
10     *conduct.*

11  *Id.* (emphasis added). The court concluded that it would be "manifestly unfair" to allow the defendants

12  to use the assertion of reliance on counsel as a defense and, at the same time, allow them to "shield any

13  inquiry into the totality of counsel's advice and its factual basis." *Id.*

14      Similarly, in *Sealy Mattress Co. v. Sealy Inc.*, the Delaware Court of Chancery concluded that

15  minority shareholders were entitled to the production of a letter written by legal counsel to his client,

16  the head of an acquiring corporation, during the negotiations of a cash-out merger. No. 8853, 1987 Del.

17  Ch. LEXIS 451, at *1-*5 (Del. Ch. June 19, 1987). The *Sealy* plaintiffs had alleged numerous breaches

18  of fiduciary duty and contended that the letter was vital to adjudicating these claims. The *Sealy* court

19  agreed, finding the letter "tend[ed] to relate the advice given by defendant's counsel to actions taken by

20  defendants that form the basis for this lawsuit . . . . [and] might also be probative of the defendants'

21  motives for taking certain of the actions challenged here." *Id.* at *10. The court concluded that the

22  privilege had been waived due to the fact that "equivalent information [was] not available from another

23  source" and that "it [was] both necessary and desirable to make the . . . letter available to the plaintiffs."

24  *Id.* at *11.

25      Under well-settled California law, and as demonstrated by the factual scenarios considered by

26  the Delaware courts in *Zirn* and *Sealy*, defendants here should not be allowed to use the attorney-client

27  and work-product doctrines as a shield to the production of information regarding the advice that they

28  were given by counsel relating to the antitrust issues which purportedly counseled against entering into

- 10 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

1  a merger agreement with PetSmart, particularly where their defense is premised on the precise

2  information contained in those communications, and there is no other source from which that

3  information can be obtained.

4  **V.      CONCLUSION**

5          For the foregoing reasons, plaintiff's Motion to Compel should be granted.

6  DATED: September 12, 2006                    Respectfully submitted,

7                                               LERACH COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
8                                               DARREN J. ROBBINS
                                                RANDALL J. BARON
9                                               A. RICK ATWOOD, JR.
                                                STEPHEN J. ODDO
10                                              DAVID T. WISSBROECKER

11

12                                                        DAVID T. WISSBROECKER

13
                                                655 West Broadway, Suite 1900
14                                              San Diego, CA 92101
                                                Telephone: 619/231-1058
15                                              619/231-7423 (fax)

16                                              ROBBINS UMEDA & FINK, LLP
                                                BRIAN J. ROBBINS
17                                              CAROLINE A. SCHNURER
                                                610 West Ash Street, Suite 1800
18                                              San Diego, CA 92101
                                                Telephone: 619/525-3990
19                                              619/525-3991 (fax)

20                                              Co-Lead Counsel for Plaintiff

21  S:\CasesSD\PETCO State\BRF00034649.doc

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

<u>DECLARATION OF SERVICE BY UPS DELIVERY</u>

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on September 12, 2006, declarant served by UPS, next day delivery, the **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEFENDANT PETCO ANIMAL SUPPLIES, INC. TO PRODUCE RELEVANT DOCUMENTS** to the parties listed on the attached Service List.  Declarant also served the parties by facsimile.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12th day of September, 2006, at San Diego, California.

ALISON K. SLOAN

PETCO STATE

Service List - 9/12/2006    (06-0163)

Page 1 of 2

**Counsel For Defendant(s)**

Robert J. Blair
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375
 619/236-1234
 619/696-7419 (Fax)


Richard M. Segal
Pillsbury Winthrop Shaw Pittman LLP
501 West Broadway, Suite 1100
San Diego, CA 92101
 619/234-5000
 619/236-1995 (Fax)


Attorney in Charge
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Anveue, N.W.
Washington, DC 20006
 202/663-6000
 202/663-6363 (Fax)


Timothy R. Pestotnik
Russell A. Gold
Pestotnik + Gold LLP
401 West A Street, Suite 1600
San Diego, CA 92101
 619/237-3000
 619/342-8020 (Fax)


Eric S. Waxman
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
 213/687-5000
 213/687-5600 (Fax)


**Counsel For Plaintiff(s)**

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
 615/244-2202
 615/252-3798 (Fax)


William K. Cavanagh, Jr.
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL 62701
 217/544-1771
 217/544-9894 (Fax)

PETCO STATE

Service List - 9/12/2006    (06-0163)
Page 2 of 2

Randall J. Baron
A. Rick Atwood
Stephen J. Oddo
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)


Brian J. Robbins
Caroline A. Schnurer
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
  619/525-3990
  619/525-3991 (Fax)

Joe Kendall
Willie C. Briscoe
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
  214/744-3000
  214/744-3015 (Fax)

1  LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  DARREN J. ROBBINS (168593)
   RANDALL J. BARON (150796)
3  A. RICK ATWOOD, JR. (156529)
   STEPHEN J. ODDO (174828)
4  DAVID T. WISSBROECKER (243867)
   655 West Broadway, Suite 1900
5  San Diego, CA 92101
   Telephone: 619/231-1058
6  619/231-7423 (fax)

7  ROBBINS UMEDA & FINK, LLP
   BRIAN J. ROBBINS (190264)
8  CAROLINE A. SCHNURER (206088)
   610 West Ash Street, Suite 1800
9  San Diego, CA 92101
   Telephone: 619/525-3990
10 619/525-3991 (fax)

11 Co-Lead Counsel for Plaintiff

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                        COUNTY OF SAN DIEGO

14 In re PETCO ANIMAL SUPPLIES, INC.    )   Lead Case No. GIC 869399
   SHAREHOLDER LITIGATION             )
15                                      )   CLASS ACTION
   _____ )
16 This Document Relates To:            )   DECLARATION OF DAVID T.
                                        )   WISSBROECKER IN SUPPORT OF
17      ALL ACTIONS.                     )   PLAINTIFF'S MOTION TO COMPEL
                                        )   DEFENDANT PETCO ANIMAL SUPPLIES,
18                                      )   INC. TO PRODUCE RELEVANT
   _____ )   DOCUMENTS
19
                                            DATE:    To Be Determined  SEP 2 9 2006
20                                          TIME:    To Be Determined
                                            DEPT:    61
21                                          DATE ACTION FILED 07/19/06

22

23

24

25

26

27

28

F I L E D
Clerk of the Superior Court
SEP 1 3 2006
By: M. SPIESMAN, Deputy

1    I, DAVID T. WISSBROECKER, hereby declare as follows:

2    1.    I am an attorney at law, licensed to practice in the State of California. I am a member of

3    the law firm Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin"), one of the

4    counsel of record for plaintiff in the above-captioned matter. I make this declaration in support of

5    Plaintiff's Motion to Compel Defendant PETCO Animal Supplies, Inc. to Produce Relevant Documents

6    ("Motion"). I have personal knowledge of the matters stated herein and, if called upon, I could and

7    would competently testify thereto.

8    2.    On September 11, 2006, counsel for plaintiff and defendant PETCO Animal Supplies,

9    Inc. ("PETCO") participated in a meet and confer discussion regarding PETCO's objections. Counsel

10    for PETCO stated that PETCO is refusing to produce any documents relating to purported antitrust

11    concerns involved in a potential merger between PETCO and PetSmart on the basis that such

12    documents are protected by attorney-client and/or work-product privilege. Counsel for PETCO also

13    stated that defendants intend to defend their decision not to enter into a merger agreement with

14    PetSmart on the basis of advice that they received from antitrust counsel concerning potential regulatory

15    intervention that purportedly could delay such a merger and/or prevent its consummation.

16    3.    A true and correct copy of Plaintiffs' First Request for Production of Documents to

17    Defendants PETCO Animal Supplies, Inc., James M. Myers, Brian K. Devine and John G. Danhakl is

18    attached hereto as Exhibit A.

19    4.    A true and correct copy of PETCO Animal Supplies, Inc.'s Response to Plaintiffs' First

20    Request for Production of Documents to Defendants PETCO Animal Supplies, Inc., James M. Myers,

21    Brian K. Devine and John G. Danhakl is attached hereto as Exhibit B.

22    I declare under penalty of perjury under the laws of the State of California that the foregoing is

23    true and correct. Executed this 12th day of September, 2006, at San Diego, California.

24

25    DAVID T. WISSBROECKER

26

27    S:\CasesSD\PETCO State\DEC00034699.doc

28

- 1 -

# EXHIBIT A

1 | LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | DARREN J. ROBBINS (168593)
RANDALL J. BARON (150796)
3 | A. RICK ATWOOD, JR. (156529)
STEPHEN J. ODDO (174828)
4 | 655 West Broadway, Suite 1900
San Diego, CA 92101
5 | Telephone: 619/231-1058
619/231-7423 (fax)
6 |
Attorneys for Plaintiffs
7 |
[Additional counsel appear on signature page.]
8 |

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| BILL J. HARRIS, On Behalf of Himself and All Others Similarly Situated, ) ) ) ) ) ) ) ) ) ) ) | Case No. GIC 869399 |
| Plaintiff, | CLASS ACTION |
| vs. | DATE ACTION FILED 07/19/06 |
| PETCO ANIMAL SUPPLIES, INC., et al., | |
| Defendants. | |
| PLUMBERS LOCAL #65 PENSION FUND, On Behalf of Itself and All Others Similarly Situated, ) ) ) ) ) ) ) ) ) ) ) | Case No. GIC 869508 |
| Plaintiff, | CLASS ACTION |
| vs. | DATE ACTION FILED 07/21/06 |
| PETCO ANIMAL SUPPLIES, INC., et al., | |
| Defendants. | |

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS PETCO ANIMAL SUPPLIES, INC., JAMES M. MYERS, BRIAN K. DEVINE AND JOHN G. DANHAKL

**EXHIBIT A**

1    Pursuant to California Code of Civil Procedure §§2031.010 *et seq.*, plaintiffs hereby demands

2    Petco Animal Supplies, Inc., Brian K. Devine, James M. Myers and John G. Danhakl to produce the

3    documents described below for inspection and copying at the law offices of Lerach Coughlin Stoia

4    Geller Rudman & Robbins LLP, 655 W. Broadway, Suite 1900, San Diego, CA 92101, on or before

5    September 8, 2006, at 10:00 a.m., or at such other location and date upon which the parties may

6    mutually agree.

7    **I.    DEFINITIONS**

8        1.    "You" and "your" refer to the person responding to these Requests.

9        2.    "PETCO" means PETCO Animal Supplies, Inc. and its predecessors, successors,

10   divisions, subsidiaries, officers, directors, employees, agents or anyone acting or purporting to act on its

11   behalf.

12       3.    The term "Individual Defendants" means Brian K. Devine, James M. Myers, John G.

13   Danhakl, David B. Appel, Sandra N. Bane, David T. Ching, Julian C. Day, Peter Maslen and Charles

14   W. Duddles.

15       4.    "Leonard Green" means Leonard Green & Partners L.P. and any of its predecessors,

16   successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or

17   purporting to act on its behalf.

18       5.    "Texas Pacific" means Texas Pacific Group and any of its predecessors, successors,

19   divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to

20   act on its behalf.

21       6.    "Buyout Group" means Leonard Green and Texas Pacific collectively.

22       7.    "Person" or "persons" means and refers to natural persons, proprietorships, corporations,

23   partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and

24   other agencies.

25       8.    The term "Proposed Acquisition" means the proposed acquisition of PETCO by Buyout

26   Group announced on July 14, 2006 pursuant to which PETCO shareholders would receive

27   approximately $29 cash for each PETCO share they own.

28

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

9.      The term "Offer" means any proposal or expression of interest concerning any acquisition, merger, consolidation, share exchange, business combination or other similar transaction or series of related transactions involving PETCO or any subsidiary of PETCO or any offer to purchase, tender offer, exchange offer or any similar transaction or series of related transactions made by any person involving 5% or more of the outstanding shares of any class of PETCO securities.

10.     The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood.  "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

11.     The term "loans" means any financial arrangement created or secured by, with, through or because of either PETCO or Buyout Group which allows or allowed any of the Individual Defendants to acquire money or any other consideration from PETCO, Buyout Group or a third party.

12.     The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries, telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities.  The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in

- 2 -

1    your possession, custody or control, or in the possession, custody or control of your advisors, agents,

2    employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on

3    your behalf.

4          13.    The term "electronic data" refers to any original and any non-identical copies (whether

5    non-identical because of notes made on copies or attached comments, annotations, marks, transmission

6    notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other

7    programs (whether private, commercial, or work-in-progress), programming notes or instructions,

8    activity listings of electronic mail receipts or transmittals, output resulting from the use of any software

9    program, including word processing documents, spreadsheets, database files, charts, graphs and

10   outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger

11   messages, operating systems, source code of all types, programming languages, linkers and compilers,

12   peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables,

13   logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which

14   they reside and regardless of whether said electronic data consists of an active file, deleted file or file

15   fragment. "Electronic data" also includes any and all items stored on computer memory or memories,

16   hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic

17   tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including, but

18   not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data

19   storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any

20   physical storage device associated with each original and each copy.

21          14.    The term "Financial Statements" includes, but is not limited to, interim, final, pro forma,

22   actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or

23   unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous

24   income, schedules of general services, fiscal serviceman administrative services, statements of earnings

25   and earnings per share, income statements, cash flow statements, statement of revenues and statements

26   of expenses, all notes or other commentary concerning any of the foregoing and all underlying work

27   papers and all drafts used in connection with the preparation of any of the foregoing.

28

15.    The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16.    "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind.  The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17.    The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18.    "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19.    "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20.    The terms "all" and "each" shall be construed as all/each.

21.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22.    "SEC" means the Securities and Exchange Commission.

23.     "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

## II.     INSTRUCTIONS

1.     In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

2.     References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

3.     If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds.  If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

4.     If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) he person who destroyed it; and (viii) why it was lost or destroyed.

5.     If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter.  If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the

- 5 -

1  Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply

2  letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom

3  it is addressed as a modification of the particular Request.

4       6. . Unless words or terms have been given a specific definition herein, each word or term

5  used herein shall be given its usual and customary dictionary definition except where such words have a

6  specific custom and usage definition in your trade or industry, in which case they shall be interpreted in

7  accordance with such usual custom and usage definition of which you are aware. In construing the

8  Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii)

9  a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the

10  interpretation applied results in the more expansive production.

11       7. In making production, produce all documents as kept in the normal course of business

12  and identify the file from which each document was taken.

13  **III.  TIME PERIOD**

14       Unless stated otherwise, the time period to which these Requests refer is January 1, 2005

15  through the date of production. If a document prepared before this period is necessary for a correct or

16  complete understanding of any document covered by a Request, you must produce the earlier or

17  subsequent document as well. If any document is undated and the date of its preparation cannot be

18  determined, the document shall be produced if otherwise responsive to the production Request.

19  **IV.  DOCUMENTS REQUESTED**

20  REQUEST NO. 1:

21       PETCO's Articles of Incorporation and Bylaws, including, without limitation, all amendments

22  or changes thereto.

23  REQUEST NO. 2:

24       All minutes (with exhibits/attachments) of all meetings of the Board of Directors of PETCO or

25  any committee or subcommittee thereof, including all drafts thereof, where there was discussion of any

26  Offer (including, without limitation, the Proposed Acquisition), or of any efforts which could result in

27  an Offer, including, without limitation, the minutes (with exhibits/attachments) of other meetings

28  referenced therein, including all drafts thereof.

- 6 -

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

REQUEST NO. 3:

All documents reviewed by the Individual Defendants or reviewed by any officer, executive or financial advisor of PETCO concerning any Offer (including, without limitation, the Proposed Acquisition) or of any efforts which could result in an Offer.

REQUEST NO. 4:

Each Agreement and Plan of Merger contemplated by Buyout Group and PETCO, all related exhibits and schedules, and all drafts thereof.

REQUEST NO. 5:

All documents concerning communications concerning any Offer (including, without limitation, the Proposed Acquisition) or of any efforts which could result in an Offer or any other strategic alternatives, including, without limitation:

(a)    all internal communications of PETCO or between PETCO and Buyout Group, including, without limitation, executive summaries, memoranda or electronic mail;

(b)    all communications between any of the Individual Defendants, including, without limitation, electronic mail, faxes or letters transmitted outside the office;

(c)    all communications between PETCO and any potential acquirers of PETCO;

(d)    all communications between any of the Individual Defendants and Buyout Group;

(e)    all communications between PETCO and any financial institution, accounting firm, auditing firm, investment banking firm or advisor; and

(f)    all communications sent to, or prepared to be sent to, any person on behalf of PETCO.

REQUEST NO. 6:

All documents concerning the engagement or retention of any financial institution, accounting firm, auditing firm or investment banking firm to provide services concerning any Offer (including, without limitation, the Proposed Acquisition), or of any efforts which could result in an Offer, other strategic alternatives or services concerning the valuation of PETCO.

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

1 REQUEST NO. 7:

2     All personal files, expense reports or logs, diaries, notebooks, notes, date books, calendars,

3 appointment books, address books or Telephone Records maintained by or for the Individual

4 Defendants or by or for any PETCO officer or executive concerning any Offer (including, without

5 limitation, the Proposed Acquisition).

6 REQUEST NO. 8:

7     All documents concerning financial due diligence concerning any Offer (including, without

8 limitation, the Proposed Acquisition) or any other strategic alternatives.

9 REQUEST NO. 9:

10     All appraisals, analyses, opinions, reviews, Financial Statements or other documents concerning

11 the financial results, value, market value, fair value, or inherent value of the stock or any of the assets or

12 businesses of PETCO.

13 REQUEST NO. 10:

14     All financial projections, budgets and plans of future operations concerning PETCO.

15 REQUEST NO. 11:

16     All documents concerning assumptions underlying any analyses, opinions, or projections

17 concerning PETCO.

18 REQUEST NO. 12:

19     All documents provided by PETCO and/or the Individual Defendants to any financial

20 institution, accounting firm, auditing firm, investment banking firm or advisor.

21 REQUEST NO. 13:

22     All documents provided by any financial institution, accounting firm, auditing firm, investment

23 banking firm or advisor to PETCO and/or the Individual Defendants.

24 REQUEST NO. 14:

25     All documents concerning the business relationship between PETCO and any of its affiliates or

26 subsidiaries and Buyout Group and any of their affiliates or subsidiaries (including the Individual

27 Defendants) including, without limitation, any management agreements, consulting agreements, or any

28 other agreements without regard to the Time Period.

- 8 -

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

REQUEST NO. 15:

All confidentiality agreements entered as a result of discussions concerning any Offer, including, without limitation, the Proposed Acquisition.

REQUEST NO. 16:

All documents concerning any opinion from any investment banking firm concerning the fairness of the Proposed Acquisition.

REQUEST NO. 17:

All documents concerning any actual or proposed consideration, including any potential adjustments to such consideration, to be paid to PETCO shareholders as a result of the consummation of any Offer (including, without limitation, the Proposed Acquisition).

REQUEST NO. 18:

All documents concerning any business relationship between PETCO and any Individual Defendant, or between any of the Individual Defendants, including, without limitation, any management agreement, partnership agreement, consulting agreement or any other agreement. (This Request is made without regard to the "Time Period" limitation set forth in Section III herein.)

REQUEST NO. 19:

All documents identifying any business affiliations between any of the Individual Defendants, or between any of the Individual Defendants and Buyout Group, or between any of the Individual Defendants and PETCO, including, without limitation, common board memberships or common membership in any business organization.

REQUEST NO. 20:

All documents sufficient to identify the individual directors, officers and managerial-level employees of PETCO, their duties and responsibilities, their respective dates of service and any vested or unvested options to purchase PETCO stock, and if any such persons have resigned or been terminated or removed, all documents concerning such resignation, termination or removal and the reasons therefore.

1   REQUEST NO. 21:

2       All documents concerning each of the Individual Defendants' purchases, sales, gifts, grants,

3   options, or ownership, either directly, indirectly or beneficially, of PETCO or Buyout Group securities

4   of any type or class, including, without limitation, documents summarizing: (1) stock held by the

5   Individual Defendants; and (2) options held by the Individual Defendants, their grant date, vesting date,

6   exercise date, expiration date, price and amount or proceeds to be realized from cancellation or cash-out

7   due to any Offer (including, without limitation, the Proposed Acquisition). (This Request is made

8   without regard to the "Time Period" limitation set forth in Section III herein.)

9   REQUEST NO. 22:

10      All documents concerning the Individual Defendants' or any PETCO officer's compensation,

11  employment, severance, retention bonus, non-competition, change-of-control, or consulting agreements,

12  or other corporate perquisites, including, without limitation, executed and all draft copies of any such

13  agreements. (This Request is made without regard to the "Time Period" limitation set forth in Section

14  III herein.)

15  REQUEST NO. 23:

16      All documents concerning the proposed, potential, anticipated, or agreed-upon capital structure

17  of the surviving entity or entities, upon or following consummation of the Proposed Acquisition.

18  REQUEST NO. 24:

19      All documents identifying the directors of the surviving entity or entities following

20  consummation of the Proposed Acquisition.

21  REQUEST NO. 25:

22      All documents concerning loans made by PETCO or Buyout Group to any of PETCO's officers

23  or to any of the Individual Defendants, or any agreements by which any of the PETCO's officers or

24  Individual Defendants borrowed money or received any incentives or any gifts from PETCO or Buyout

25  Group. (This Request is made without regard to the "Time Period" limitation set forth in Section III

26  herein.)

27

28

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

1  REQUEST NO. 26:

2       All indemnification agreements entered into between PETCO and any of the Individual

3  Defendants which may be invoked in connection with this action. (This request is made without regard

4  to the "Time Period" limitation set forth at Section III herein.)

5  REQUEST NO. 27:

6       All documents concerning any presentations made by or on behalf of any investment banking

7  institution, financial institution, financial advisor, appraiser, tax advisor or accountant to any defendant

8  concerning any Offer (including, without limitation, the Proposed Acquisition).

9  REQUEST NO. 28:

10       All non-public documents given to potential purchasers of PETCO regarding the sale of PETCO

11 (including bankers' presentation books).

12 REQUEST NO. 29:

13       All documents concerning any actual or proposed changes in the terms of the Proposed

14 Acquisition or the right or option to terminate, amend or modify the terms of the Proposed Acquisition.

15 REQUEST NO. 30:

16       All documents concerning any change in the price of PETCO shares since the announcement of

17 the Proposed Acquisition.

18 REQUEST NO. 31:

19       All documents concerning press releases, published articles, financial analysts' reports and

20 rating agencies' reports, and all drafts thereof, concerning PETCO.

21 REQUEST NO. 32:

22       All documents concerning SEC filings concerning any Offer (including, without limitation, the

23 Proposed Acquisition), any other strategic alternatives, including, without limitation, drafts of past

24 filings and drafts of documents to be filed with the SEC.

25 REQUEST NO. 33:

26       All documents concerning any policy, procedure or practice concerning the preservation or

27 destruction of the documents or electronic data or types of documents or electronic data sought herein.

28

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

1  REQUEST NO. 34:

2      All documents concerning insurance polices or indemnification agreements that may provide

3  coverage to any Individual Defendant or PETCO, individually or collectively, for any claims or causes

4  of action asserted in this action or that may provide reimbursement for payments made in defense of

5  this action, including, without limitation, loss mitigation insurance or liability-sharing arrangements,

6  including options to purchase such insurance or sharing arrangements, whether acquired before or after

7  the initiation of the litigation.

8  REQUEST NO. 35:

9      All documents concerning any stockholder agreements and/or voting agreements between

10 Buyout Group and any stockholders of PETCO.

11 DATED:  August __, 2006                    LERACH COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
12                                             DARREN J. ROBBINS
                                               RANDALL J. BARON
13                                             A. RICK ATWOOD, JR.
                                               STEPHEN J. ODDO
14

15

16                                                     RANDALL J. BARON

17                                             655 West Broadway, Suite 1900
                                               San Diego, CA  92101
18                                             Telephone:  619/231-1058
                                               619/231-7423 (fax)
19

20

21

22

23

24

25

26

27

28

- 12 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROVOST & UMPHREY LAW FIRM, LLP
JOE KENDALL
WILLIE C. BRISCOE
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN  37201-1601
Telephone:  615/244-2202
615/252-3798 (fax)

CAVANAGH & O'HARA
WILLIAM K. CAVANAGH, JR.
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiffs

S:\CasesSD\PETCO State\REQ00033682.doc

- 13 -

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

1          <u>DECLARATION OF SERVICE BY UPS DELIVERY</u>

2          I, the undersigned, declare:

3          1.      That declarant is and was, at all times herein mentioned, a citizen of the United States

4   and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested

5   party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San

6   Diego, California 92101.

7          2.      That on August 7, 2006, declarant served by UPS, next day delivery, the **PLAINTIFFS'**

8   **FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS PETCO**

9   **ANIMAL   SUPPLIES,   INC.,   JAMES   M.   MYERS,   BRIAN   K.   DEVINE   AND**

10  **JOHN G. DANHAKL** to the parties listed on the attached Service List.

11         I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of

12  August, 2006, at San Diego, California.

13

14                                              ALISON K. SLOAN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETCO STATE

Service List - 8/7/2006     (06-0163)

Page 1 of 2

**Counsel For Defendant(s)**

Robert J. Blair
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375
   619/236-1234
   619/696-7419 (Fax)

Richard M. Segal
Pillsbury Winthrop Shaw Pittman LLP
501 West Broadway, Suite 1100
San Diego, CA 92101
   619/234-5000
   619/236-1995 (Fax)

Eric S. Waxman
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
   213/687-5000
   213/687-5600 (Fax)

**Counsel For Plaintiff(s)**

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
   615/244-2202
   615/252-3798 (Fax)

William K. Cavanagh, Jr.
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL 62701
   217/544-1771
   217/544-9894 (Fax)

Randall J. Baron
A. Rick Atwood
Stephen J. Oddo
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
   619/231-1058
   619/231-7423 (Fax)

Joe Kendall
Willie C. Briscoe
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
   214/744-3000
   214/744-3015 (Fax)

PETCO STATE

Service List - 8/7/2006    (06-0163)

Page 2 of 2

Brian J. Robbins
Caroline A. Schnurer
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101
  619/525-3990
  619/525-3991 (Fax)

# EXHIBIT B

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    KIRKE M. HASSON  61446
2   50 Fremont Street
    San Francisco, CA  94105-2228
3   Telephone: (415) 983-1000
    Facsimile: (415) 983-1200
4
    PILLSBURY WINTHROP SHAW PITTMAN LLP
5   RICHARD M. SEGAL  156975
    C.J. MARTIN  228630
6   501 W. Broadway, Suite 1100
    San Diego, CA  92101-3575
7   Telephone: (619) 234-5000
    Facsimile: (619) 236-1995
8
    Attorneys for Defendant
9   PETCO ANIMAL SUPPLIES, INC.

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  IN AND FOR THE COUNTY OF SAN DIEGO

12

13  In re PETCO ANIMAL SUPPLIES, INC.        )  Lead Case No. GIC 869399
    SHAREHOLDER LITIGATION                   )
14                                           )
                                             )  CLASS ACTION
15                                           )
    This Document Relates to:                )  PETCO ANIMAL SUPPLIES, INC.'S
16                                           )  RESPONSE TO PLAINTIFFS' FIRST
        ALL ACTIONS.                         )  REQUEST FOR PRODUCTION OF
17                                           )  DOCUMENTS TO DEFENDANTS
                                             )  PETCO ANIMAL SUPPLIES, INC.,
18                                           )  JAMES M. MYERS, BRIAN K.
                                             )  DEVINE AND JOHN G. DANHAKL
19                                           )
                                             )  Action Filed:  July 19, 2006
20                                           )  Amended Complaint Filed: August 28,
                                             )  2006

21  PROPOUNDING PARTY:     Plaintiffs BILL J. HARRIS and PLUMBERS LOCAL
                           #65 PENSION FUND
22
    RESPONDING PARTY:      Defendant PETCO ANIMAL SUPPLIES, INC.
23
24  SET NUMBER:            One (1)

25

26

27

28

PETCO ANIMAL SUPPLIES, INC.'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

# EXHIBIT B

1       Pursuant to California Code of Civil Procedure Section 2031.210, Defendant

2   PETCO ANIMAL SUPPLIES, INC. ("Defendant" or "PETCO") hereby responds and

3   objects to Plaintiffs' BILL J. HARRIS and PLUMBERS LOCAL #65 PENSION FUND

4   ("Plaintiffs") First Request for Production of Documents as follows:

5                                    INTRODUCTION

6       These responses are based upon the information presently known and available to

7   Defendant and its attorneys.  Defendant has not completed its investigation or discovery.

8   Defendant anticipates that further discovery, investigation, legal research, and analysis may

9   lead to changes or variations in the responses referenced below.  Without obligating itself to

10  do so, Defendant hereby reserves the right to supplement, revise, modify, or amend these

11  responses and to correct any inadvertent errors or omissions which may be contained

12  herein, and to rely upon such information in subsequent proceedings, motions, or at the trial

13  in this action.

14                                SPECIFIC OBJECTIONS

15      1.      An objection that a request is "UNDULY BURDENSOME" is an objection

16  that the request is unjustly burdensome and oppressive, harassing in nature, and/or would

17  require Defendant to incur an undue expenditure of time and money to answer the request

18  and/or to search for, locate, and produce any responsive documents or things.

19      2.      An objection that a request is "OVERLY BROAD" is an objection that the

20  request is overly broad and not properly limited in time and/or scope.

21      3.      An objection that a request is "ATTORNEY-CLIENT AND ATTORNEY

22  WORK PRODUCT PRIVILEGE" is an objection that the request seeks information

23  protected by the attorney-client privilege and/or the attorney work product doctrine.

24      4.      An objection that a request is "NOT RELEVANT" is an objection that the

25  information, documents, or things sought by the demand are neither relevant to the subject

26  matter of this action nor reasonably calculated to lead to the discovery of admissible

27  evidence.

28

1    5.    An objection that a request is "VAGUE" is an objection that the request is

2    vague, ambiguous, uncertain, argumentative, unintelligible, and/or indefinite.

3    6.    An objection on the ground that a request is "DUPLICATIVE" is an

4    objection that it is duplicative or cumulative of a prior discovery request propounded by

5    Plaintiff.

6    7.    An objection on the ground of "RIGHT OF PRIVACY" is an objection that

7    the request seeks information that if produced would or might infringe on: (1) the privacy

8    rights of persons not parties to this lawsuit; or (2) the financial privacy rights of a party or

9    parties to this lawsuit.

10    8.    An objection on the ground of "PUBLIC RECORD" is an objection that the

11    request seeks information that is available from sources of public information and is equally

12    available to the propounding party, and that it would be UNDULY BURDENSOME for

13    Defendant to search for and produce such information for that reason.

14    <u>GENERAL OBJECTIONS</u>

15    In addition to those grounds for objection which may be set forth specifically in

16    response to a particular request, Defendant objects generally to each request on the

17    following grounds, and each of Defendant's individual responses incorporates, and is to be

18    read in light of, these General Objections:

19    1.    Defendant's investigation and discovery in this case is ongoing. As such,

20    the following responses and objections are provided without prejudice to present further

21    information responsive to these Requests as the information is uncovered.

22    2.    Except for explicit facts admitted herein, no admissions of any nature

23    whatsoever are implied or should be inferred from the responses or objections to the

24    Requests.

25    3.    Defendant objects to the Requests and specifically to each Request therein to

26    the extent that it purports to impose obligations beyond those imposed or authorized by

27    California law.

28

1      4.      Defendant objects to the Requests and specifically to each Request therein to

2  the extent it calls for information which is protected from disclosure by: (a) the attorney-

3  client privilege; (b) the attorney work product doctrine; or (c) any other applicable privilege

4  or doctrine.  Defendant will not provide any information it contends is protected under any

5  such privilege and/or doctrine.

6      5.      Defendant objects to any Request to the extent that it seeks the production of

7  "all," "each," "any," or "every" document of a specific nature or type when a limited

8  number of such documents would supply the requested information, on the grounds that

9  such a requirement makes the request overbroad, unduly burdensome, and oppressive.

10      6.      Defendant objects to the Requests and specifically to each Request therein to

11  the extent it purports to require Defendant to provide any information: not in its possession,

12  custody, or control; in the possession of some other person or entity, including any

13  insurance company (or its agents and employees); or already in the possession of Plaintiffs

14  or their counsel, or equally available to Plaintiffs or their counsel; on the grounds that such

15  Request is unnecessary, unduly burdensome, and oppressive, constitutes annoyance,

16  harassment, and oppression and goes beyond the obligations imposed or authorized by

17  California law.  Accordingly, Defendant objects to the Requests to the extent they call for

18  information or documents that are not in its individual possession.

19      7.      Defendant objects to the Requests and specifically to each Request therein to

20  the extent it seeks information that would constitute trade secrets or otherwise proprietary

21  information of Defendant or information that would constitute trade secrets or otherwise

22  proprietary information of other parties or non-parties that Defendant may possess pursuant

23  to a confidentiality agreement or arrangement between Defendant and such other parties or

24  non-parties that would prohibit production of such documents.  No such information will be

25  produced unless and until an appropriate confidentiality order is entered by the Court to

26  protect such trade secrets or otherwise proprietary information from public disclosure

27  and/or other misuse.

28

600188524v4

- 4 -

PETCO ANIMAL SUPPLIES, INC.'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

8.    Defendant objects to the Requests to the extent they call for any documents made available to any other person or entity through the "clean room" procedure described in the preliminary proxy statement filed by Defendant with the SEC regarding the acquisition transaction at issue in this litigation.  The documents in the "clean room" are of the most competitively sensitive nature and are not reasonably necessary to the proper litigation of this matter.  Any disclosure of these documents to the public or to any third party, including to plaintiffs' counsel pursuant to a protective order, would severely prejudice Defendant and place Defendant at serious risk of substantial competitive disadvantage.  Notwithstanding any statement to the contrary in the individual responses below, no documents in the "clean room" will be produced.

9.    Defendant objects to the Requests to the extent they seek information in which non-parties may have confidentiality or privacy interests under either the United States Constitution or the Constitution of the State of California.

10.    These responses are given without waiving, and expressly reserving: (a) all objections as to the competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceeding in this action, including the arbitration of this action, or in any other action; (b) all privileges, including the attorney-client privilege and the work product doctrine; and (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action, including any arbitration of this action, or in any other action.

11.    Defendant objects to the time and location specified for the production of documents as unreasonable and unduly burdensome.  To the extent Defendant produces documents in response to the Requests, it will do so at the offices of its attorneys once it has completed a reasonable search for responsive materials.

12.    Defendant objects to the Requests and specifically to each Request therein to the extent that they may be construed to seek information not related to the acquisition proposals considered by Defendant since March 2006 referred to in Plaintiffs' amended

1   complaint (the "Acquisition Proposals"). Defendant will not produce any documents that

2   do not relate to either of the Acquisition Proposals or to Defendant's consideration thereof.

3        13.    Any statement in these responses that responsive documents will be

4   produced may not be construed to indicate that such documents actually exist or that such

5   documents are in the possession, custody or control of Defendant. Rather, to the extent that

6   Defendant agrees to produce such responsive documents, Defendant will produce all such

7   documents within its possession, custody or control that can be located based on a

8   reasonably diligent search.

9        14.    These General Objections are hereby incorporated by this reference into the

10  Responses below.

11                          RESPONSES AND OBJECTIONS

12  REQUEST FOR PRODUCTION NO. 1:

13       PETCO's Articles of Incorporation and Bylaws, including, without limitation, all

14  amendments or changes thereto.

15  RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

16       In addition to the General Objections set forth above, PETCO objects to this

17  Request on the following grounds: NOT RELEVANT and PUBLIC RECORD. Subject to

18  and without waiving such objections, PETCO responds to this Request as follows: PETCO

19  will produce its Articles of Incorporation and bylaws in the forms currently in effect.

20  REQUEST FOR PRODUCTION NO. 2:

21       All minutes (with exhibits/attachments) of all meetings of the Board of Directors of

22  PETCO or any committee or subcommittee thereof, including all drafts thereof, where there

23  was discussion of any Offer (including, without limitation, the Proposed Acquisition), or of

24  any efforts which could result in an Offer, including, without limitation, the minutes (with

25  exhibits/attachments) of other meetings, referenced therein, including all drafts thereof.

26  RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

27       In addition to the General Objections set forth above, PETCO objects to this

28  Request on the following grounds: VAGUE and ATTORNEY-CLIENT AND ATTORNEY

1  WORK PRODUCT PRIVILEGE.  Subject to and without waiving such objections, PETCO

2  responds to this Request as follows: PETCO will produce final, committee- and or board-

3  approved minutes of all meetings of the committee of PETCO's independent directors

4  established to review and consider strategic alternatives wherein either of the Acquisition

5  Proposals were discussed.

6  REQUEST FOR PRODUCTION NO. 3:

7      All documents reviewed by the Individual Defendants or reviewed by any officer,

8  executive or financial advisor of PETCO concerning any Offer (including, without

9  limitation, the Proposed Acquisition) or of any efforts which could result in an Offer.

10  RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

11      In addition to the General Objections set forth above, PETCO objects to this

12  Request on the following grounds: ATTORNEY-CLIENT AND ATTORNEY WORK

13  PRODUCT PRIVILEGE, OVERLY BROAD, UNDULY BURDENSOME, NOT

14  RELEVANT and PUBLIC RECORD.  Subject to and without waiving such objections,

15  PETCO responds to this Request as follows: PETCO will produce all documents reviewed

16  by the Individual Defendants, by any officer of PETCO or by UBS (the investment bank

17  retained by the Independent Committee to assist it in evaluating the Acquisition Proposals)

18  regarding the Acquisition Proposals.

19  REQUEST FOR PRODUCTION NO. 4:

20      Each Agreement and Plan of Merger contemplated by Buyout Group and PETCO,

21  all related exhibits and schedules, and all drafts thereof.

22  RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

23      In addition to the General Objections set forth above, PETCO objects to this

24  Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

25  WORK PRODUCT DOCTRINE, VAGUE and PUBLIC RECORD.  Subject to and without

26  waiving such objections, PETCO responds to this Request as follows:  PETCO will produce

27  all drafts of merger agreements actually exchanged between representatives of PETCO and

28  Buyout Group.

PETCO ANIMAL SUPPLIES, INC.'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

1    <u>REQUEST FOR PRODUCTION NO. 5:</u>

2    All documents concerning communications concerning any Offer (including,

3    without limitation, the Proposed Acquisition) or of any efforts which could result in an

4    Offer or any other strategic alternatives, including, without limitation:

5    (a)    all internal communications of PETCO or between PETCO and Buyout

6    Group, including, without limitation, executive summaries, memoranda or electronic mail;

7    (b)    all communications between any of the Individual Defendants, including,

8    without limitation, electronic mail, faxes or letters transmitted outside the office;

9    (c)    all communications between PETCO and any potential acquirers of PETCO;

10    (d)    all communications between any of the Individual Defendants and Buyout

11    Group;

12    (e)    all communications between PETCO and any financial institution,

13    accounting firm, auditing firm, investment banking firm or advisor; and

14    (f)    all communications sent to, or prepared to be sent to, any person on behalf of

15    PETCO.

16    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 5:</u>

17    In addition to the General Objections set forth above, PETCO objects to this

18    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

19    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME, NOT

20    RELEVANT, DUPLICATIVE and PUBLIC RECORD. Subject to and without waiving

21    such objections, PETCO responds to this Request as follows: PETCO will produce all

22    documents reviewed by the Individual Defendants, by any officer of PETCO or by UBS

23    regarding the Acquisition Proposals.

24    <u>REQUEST FOR PRODUCTION NO. 6:</u>

25    All documents concerning the engagement or retention of any financial institution,

26    accounting firm, auditing firm or investment banking firm to provide services concerning

27    any Offer (including, without limitation, the Proposed Acquisition), or of any efforts which

28

1    could result in an Offer, other strategic alternatives or services concerning the valuation of

2    PETCO.

3    RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

4           In addition to the General Objections set forth above, PETCO objects to this

5    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

6    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME, NOT

7    RELEVANT and PUBLIC RECORD.  Subject to and without waiving such objections,

8    PETCO responds to this Request as follows: PETCO will produce the two reports provided

9    to the Independent Committee by UBS, the retention agreement between the Independent

10   Committee and UBS for such engagement and all information provided by PETCO to UBS

11   for evaluation of the fairness of either of the Acquisition Proposals.

12   REQUEST FOR PRODUCTION NO. 7:

13          All personal files, expense reports or logs, diaries, notebooks, notes, date books,

14   calendars, appointment books, address books or Telephone Records maintained by or for

15   the Individual Defendants or by or for any PETCO officer or executive concerning any

16   Offer (including, without limitation, the Proposed Acquisition).

17   RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

18          In addition to the General Objections set forth above, PETCO objects to this

19   Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

20   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME, NOT

21   RELEVANT and RIGHT OF PRIVACY.  Subject to and without waiving such objections,

22   PETCO responds to this Request as follows: counsel for PETCO will confer with counsel

23   for Plaintiffs to narrow this Request to an appropriate scope.

24   REQUEST FOR PRODUCTION NO. 8:

25          All documents concerning financial due diligence concerning any Offer (including,

26   without limitation, the Proposed Acquisition) or any other strategic alternatives.

27

28

1    RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

2        In addition to the General Objections set forth above, PETCO objects to this

3    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

4    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

5    VAGUE and PUBLIC RECORD.  Subject to and without waiving such objections, PETCO

6    responds to this Request as follows: PETCO will produce all documents reviewed by the

7    Individual Defendants, by any officer of PETCO or by UBS regarding the Acquisition

8    Proposals.

9    REQUEST FOR PRODUCTION NO. 9:

10        All appraisals, analyses, opinions, reviews, Financial Statements or other documents

11    concerning the financial results, value, market value, fair value, or inherent value of the

12    stock or any of the assets or businesses of PETCO.

13    RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

14        In addition to the General Objections set forth above, PETCO objects to this

15    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

16    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

17    VAGUE, DUPLICATIVE and PUBLIC RECORD.  Subject to and without waiving such

18    objections, PETCO responds to this Request as follows: PETCO will produce the two

19    reports provided to the Independent Committee by UBS and all information provided by

20    PETCO to UBS for evaluation of the fairness of either of the Acquisition Proposals.

21    REQUEST FOR PRODUCTION NO. 10:

22        All financial projections, budgets and plans of future operations concerning PETCO.

23    RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

24        In addition to the General Objections set forth above, PETCO objects to this

25    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

26    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

27    VAGUE, DUPLICATIVE and PUBLIC RECORD.  Subject to and without waiving such

28

1    objections, PETCO responds to this Request as follows: PETCO will produce company-

2    wide financial statements and company-wide budgets for calendar year 2006.

3    <u>REQUEST FOR PRODUCTION NO. 11:</u>

4         All documents concerning assumptions underlying any analyses, opinions, or

5    projections concerning PETCO.

6    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 11:</u>

7         In addition to the General Objections set forth above, PETCO objects to this

8    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

9    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

10   VAGUE, DUPLICATIVE and PUBLIC RECORD. Subject to and without waiving such

11   objections, PETCO responds to this Request as follows: PETCO will produce the two

12   reports provided to the Independent Committee by UBS and all information provided by

13   PETCO to UBS for evaluation of the fairness of either of the Acquisition Proposals.

14   <u>REQUEST FOR PRODUCTION NO. 12:</u>

15        All documents provided by PETCO and/or the Individual Defendants to any

16   financial institution, accounting firm, auditing firm, investment banking firm or advisor.

17   <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 12:</u>

18        In addition to the General Objections set forth above, PETCO objects to this

19   Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

20   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

21   VAGUE, DUPLICATIVE and PUBLIC RECORD. Subject to and without waiving such

22   objections, PETCO responds to this Request as follows: PETCO will produce the two

23   reports provided to the Independent Committee by UBS and all information provided by

24   PETCO to UBS for evaluation of the fairness of either of the Acquisition Proposals.

25   <u>REQUEST FOR PRODUCTION NO. 13:</u>

26        All documents provided by any financial institution, accounting firm, auditing firm,

27   investment banking firm or advisor to PETCO and/or the Individual Defendants.

28

PETCO ANIMAL SUPPLIES, INC.'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

1    RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

2         In addition to the General Objections set forth above, PETCO objects to this

3    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

4    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

5    VAGUE, DUPLICATIVE and PUBLIC RECORD.  Subject to and without waiving such

6    objections, PETCO responds to this Request as follows: PETCO will produce the two

7    reports provided to the Independent Committee by UBS.

8    REQUEST FOR PRODUCTION NO. 14:

9         All documents concerning the business relationship between PETCO and any of its

10   affiliates or subsidiaries and Buyout Group and any of their affiliates or subsidiaries

11   (including the Individual Defendants) including, without limitation, any management

12   agreements, consulting agreements, or any other agreements without regard to the Time

13   Period.

14   RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

15        In addition to the General Objections set forth above, PETCO objects to this

16   Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

17   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

18   VAGUE, NOT RELEVANT and PUBLIC RECORD.  Subject to and without waiving such

19   objections, PETCO responds to this Request as follows: counsel for PETCO will confer

20   with counsel for Plaintiffs to clarify and narrow this Request to an appropriate scope.

21   REQUEST FOR PRODUCTION NO. 15:

22        All confidentiality agreements entered as a result of discussions concerning any

23   Offer, including, without limitation, the Proposed Acquisition.

24   RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

25        Subject to and without waiving the General Objections set forth above, PETCO

26   responds to this Request as follows: PETCO will produce the confidentiality agreements

27   relating to the Acquisition Proposals.

28

1  <u>REQUEST FOR PRODUCTION NO. 16:</u>

2      All documents concerning any opinion from any investment banking firm

3  concerning the fairness of the Proposed Acquisition.

4  <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 16:</u>

5      In addition to the General Objections set forth above, PETCO objects to this

6  Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

7  WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME, NOT

8  RELEVANT, DUPLICATIVE and PUBLIC RECORD.  Subject to and without waiving

9  such objections, PETCO responds to this Request as follows: PETCO will produce the two

10 reports provided to the Independent Committee by UBS.

11 <u>REQUEST FOR PRODUCTION NO. 17:</u>

12      All documents concerning any actual or proposed consideration, including any

13 potential adjustments to such consideration, to be paid to PETCO shareholders as a result of

14 the consummation of any Offer (including, without limitation, the Proposed Acquisition).

15 <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 17:</u>

16      In addition to the General Objections set forth above, PETCO objects to this

17 Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

18 WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME, NOT

19 RELEVANT and PUBLIC RECORD.  Subject to and without waiving such objections,

20 PETCO responds to this Request as follows: PETCO will produce all drafts of merger

21 agreements actually exchanged between representatives of PETCO and the counterparties

22 in the two Acquisition Proposals and all communications between representatives of

23 PETCO and representatives of such counterparties regarding merger consideration in the

24 Acquisition Proposals.

25 <u>REQUEST FOR PRODUCTION NO. 18:</u>

26      All documents concerning any business relationship between PETCO and any

27 Individual Defendant, or between any of the Individual Defendants, including, without

28 limitation, any management agreement, partnership agreement, consulting agreement or any

1    other agreement. (This Request is made without regard to the "Time Period" limitation set

2    forth in Section III herein.)

3    RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

4        In addition to the General Objections set forth above, PETCO objects to this

5    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

6    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

7    VAGUE, NOT RELEVANT and PUBLIC RECORD. Subject to and without waiving such

8    objections, PETCO responds to this Request as follows: Other than the relationships as

9    directors or officers of PETCO, the Individual Defendants do not have any other "business

10    relationships" with PETCO other than Defendant Devine's consulting agreement with

11    PETCO that would come into effect upon his termination of employment with PETCO.

12    PETCO will produce the consulting agreement with Mr. Devine.

13    REQUEST FOR PRODUCTION NO. 19:

14        All documents identifying any business affiliations between any of the Individual

15    Defendants, or between any of the Individual Defendants and Buyout Group, or between

16    any of the Individual Defendants and PETCO, including, without limitation, common board

17    memberships or common membership in any business organization.

18    RESPONSE TO REQUEST FOR PRODUCTION NO. 19:

19        In addition to the General Objections set forth above, PETCO objects to this

20    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

21    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

22    VAGUE, NOT RELEVANT, RIGHT OF PRIVACY and PUBLIC RECORD. Subject to

23    and without waiving such objections, PETCO responds to this Request as follows: PETCO

24    will produce questionnaires provided by the Individual Defendants to PETCO for purposes

25    of PETCO's annual proxy statements for the two years prior to the date of this response.

26    REQUEST FOR PRODUCTION NO. 20:

27        All documents sufficient to identify the individual directors, officers and

28    managerial-level employees of PETCO, their duties and responsibilities, their respective

1    dates of service and any vested or unvested options to purchase PETCO stock, and if any

2    such persons have resigned or been terminated or removed, all documents concerning such

3    resignation, termination or removal and the reasons therefore.

4    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 20</u>:

5         In addition to the General Objections set forth above, PETCO objects to this

6    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

7    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

8    VAGUE, NOT RELEVANT, RIGHT OF PRIVACY and PUBLIC RECORD. Subject to

9    and without waiving such objections, PETCO responds to this Request as follows: PETCO

10    will not produce any documents in response to this Request.

11    <u>REQUEST FOR PRODUCTION NO. 21</u>:

12         All documents concerning each of the Individual Defendants' purchases, sales, gifts,

13    grants, options, or ownership, either directly, indirectly or beneficially, of PETCO or

14    Buyout Group securities of any type or class, including, without limitation, documents

15    summarizing: (1) stock held by the Individual Defendants; and (2) options held by the

16    Individual Defendants, their grant date, vesting date, exercise date, expiration date, price

17    and amount or proceeds to be realized from cancellation or cash-out due to any Offer

18    (including, without limitation, the Proposed Acquisition). (This Request is made without

19    regard to the "Time Period" limitation set forth in Section III herein.)

20    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 21</u>:

21         In addition to the General Objections set forth above, PETCO objects to this

22    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

23    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

24    VAGUE, NOT RELEVANT and PUBLIC RECORD. Subject to and without waiving such

25    objections, PETCO responds to this Request as follows: PETCO will produce its filed SEC

26    Forms 3 and 4 for the two years prior to the date of this response.

27

28

1     REQUEST FOR PRODUCTION NO. 22:

2         All documents concerning the Individual Defendants' or any PETCO officer's

3 compensation, employment, severance, retention bonus, non-competition, change-of-

4 control, or consulting agreements, or other corporate perquisites, including, without

5 limitation, executed and all draft copies of any such agreements. (This Request is made

6 without regard to the "Time Period" limitation set forth in Section III herein.)

7     RESPONSE TO REQUEST FOR PRODUCTION NO. 22:

8         In addition to the General Objections set forth above, PETCO objects to this

9 Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

10 WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

11 VAGUE, NOT RELEVANT, RIGHT OF PRIVACY and PUBLIC RECORD. Subject to

12 and without waiving such objections, PETCO responds to this Request as follows: PETCO

13 will not produce any documents in response to this Request.

14     REQUEST FOR PRODUCTION NO. 23:

15         All documents concerning the proposed, potential, anticipated, or agreed-upon

16 capital structure of the surviving entity or entities, upon or following consummation of the

17 Proposed Acquisition.

18     RESPONSE TO REQUEST FOR PRODUCTION NO. 23:

19         In addition to the General Objections set forth above, PETCO objects to this

20 Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

21 WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

22 VAGUE, NOT RELEVANT and PUBLIC RECORD. Subject to and without waiving such

23 objections, PETCO responds to this Request as follows: PETCO will not produce any

24 documents in response to this Request.

25     REQUEST FOR PRODUCTION NO. 24:

26         All documents identifying the directors of the surviving entity or entities following

27 consummation of the Proposed Acquisition.

28

1    RESPONSE TO REQUEST FOR PRODUCTION NO. 24:

2        In addition to the General Objections set forth above, PETCO objects to this

3    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

4    WORK PRODUCT DOCTRINE, NOT RELEVANT and PUBLIC RECORD.  Subject to

5    and without waiving such objection, PETCO responds to this Request as follows: PETCO

6    will produce any such documents in its possession, custody or control that it may locate

7    based on a reasonably diligent search.

8    REQUEST FOR PRODUCTION NO. 25:

9        All documents concerning loans made by PETCO or Buyout Group to any of

10    PETCO's officers or to any of the Individual Defendants, or any agreements by which any

11    of the PETCO's officers or Individual Defendants borrowed money or received any

12    incentives or any gifts from PETCO or Buyout Group.  (This Request is made without

13    regard to the "Time Period" limitation set forth in Section III herein.)

14    RESPONSE TO REQUEST FOR PRODUCTION NO. 25:

15        In addition to the General Objections set forth above, PETCO objects to this

16    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

17    WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

18    VAGUE, NOT RELEVANT and PUBLIC RECORD.  Subject to and without waiving such

19    objection, PETCO responds to this Request as follows: PETCO has not made any loans or

20    entered into any agreements to make any loans to any officer of PETCO or Individual

21    Defendant.  PETCO will produce any documents that reflect any loans or gifts from Buyout

22    Group to any of the Individual Defendants to the extent such documents may be located

23    based upon a reasonably diligent search.

24    REQUEST FOR PRODUCTION NO. 26:

25        All indemnification agreements entered into between PETCO and any of the

26    Individual Defendants which may be invoked in connection with this action.  (This request

27    is made without regard to the "Time Period" limitation set forth at Section III herein.)

28

1    RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

2        In addition to the General Objections set forth above, PETCO objects to this

3    Request on the following grounds: NOT RELEVANT and PUBLIC RECORD. Subject to

4    and without waiving such objection, PETCO responds to this Request as follows: PETCO

5    will produce any indemnification agreements between PETCO and the Individual

6    Defendants that are currently in effect.

7    REQUEST FOR PRODUCTION NO. 27:

8        All documents concerning any presentations made by or on behalf of any

9    investment banking institution, financial institution, financial advisor, appraiser, tax advisor

10   or accountant to any defendant concerning any Offer (including, without limitation, the

11   Proposed Acquisition).

12   RESPONSE TO REQUEST FOR PRODUCTION NO. 27:

13       In addition to the General Objections set forth above, PETCO objects to this

14   Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

15   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

16   VAGUE, DUPLICATIVE and PUBLIC RECORD. Subject to and without waiving such

17   objections, PETCO responds to this Request as follows: PETCO will produce the two

18   reports provided to the Independent Committee by UBS and final, committee- and/or

19   board-approved minutes of all meetings of the Independent Committee and/or PETCO's

20   board of directors wherein either of the two UBS reports were discussed.

21   REQUEST FOR PRODUCTION NO. 28:

22       All non-public documents given to potential purchasers of PETCO regarding the

23   sale of PETCO (including bankers' presentation books).

24   RESPONSE TO REQUEST FOR PRODUCTION NO. 28:

25       In addition to the General Objections set forth above, PETCO objects to this

26   Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

27   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

28   VAGUE, NOT RELEVANT and DUPLICATIVE. Subject to and without waiving such

1    objections, PETCO responds to this Request as follows: PETCO will produce all "due

2    diligence" documents provided to either of the counterparties in the Acquisition Proposals.

3    REQUEST FOR PRODUCTION NO. 29:

4        All documents concerning any actual or proposed changes in the terms of the

5    Proposed Acquisition or the right or option to terminate, amend or modify the terms of the

6    Proposed Acquisition.

7    RESPONSE TO REQUEST FOR PRODUCTION NO. 29:

8        In addition to the General Objections set forth above, PETCO objects to this

9    Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

10   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

11   VAGUE, NOT RELEVANT, DUPLICATIVE and PUBLIC RECORD. Subject to and

12   without waiving such objections, PETCO responds to this Request as follows: PETCO will

13   produce all drafts of merger agreements actually exchanged between representatives of

14   PETCO and the Buyout Group and all communications between representatives of PETCO

15   and representatives of the Buyout Group regarding terms of such transaction.

16   REQUEST FOR PRODUCTION NO. 30:

17       All documents concerning any change in the price of PETCO shares since the

18   announcement of the Proposed Acquisition.

19   RESPONSE TO REQUEST FOR PRODUCTION NO. 30:

20       In addition to the General Objections set forth above, PETCO objects to this

21   Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

22   WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

23   VAGUE, NOT RELEVANT and PUBLIC RECORD. Subject to and without waiving such

24   objections, PETCO responds to this Request as follows: PETCO will not produce any

25   documents in response to this Request.

26   REQUEST FOR PRODUCTION NO. 31:

27       All documents concerning press releases, published articles, financial analysts'

28   reports and rating agencies' reports, and all drafts thereof, concerning PETCO.

1  RESPONSE TO REQUEST FOR PRODUCTION NO. 31:

2          In addition to the General Objections set forth above, PETCO objects to this

3  Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

4  WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

5  VAGUE, NOT RELEVANT and PUBLIC RECORD. Subject to and without waiving such

6  objections, PETCO responds to this Request as follows: PETCO will not produce any

7  documents in response to this Request.

8  REQUEST FOR PRODUCTION NO. 32:

9          All documents concerning SEC filings concerning any Offer (including, without

10  limitation, the Proposed Acquisition), any other strategic alternatives, including, without

11  limitation, drafts of past filings and drafts of documents to be filed with the SEC.

12  RESPONSE TO REQUEST FOR PRODUCTION NO. 32:

13          In addition to the General Objections set forth above, PETCO objects to this

14  Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

15  WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

16  VAGUE, NOT RELEVANT and PUBLIC RECORD. Subject to and without waiving such

17  objections, PETCO responds to this Request as follows: PETCO will produce all

18  preliminary and final proxy statements filed with the SEC in connection with the

19  Acquisition Proposals.

20  REQUEST FOR PRODUCTION NO. 33:

21          All documents concerning any policy, procedure or practice concerning the

22  preservation or destruction of the documents or electronic data or types of documents or

23  electronic data sought herein.

24  RESPONSE TO REQUEST FOR PRODUCTION NO. 33:

25          In addition to the General Objections set forth above, PETCO objects to this

26  Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

27  WORK PRODUCT DOCTRINE, OVERLY BROAD and UNDULY BURDENSOME.

28  Subject to and without waiving such objections, PETCO responds to this Request as

1   follows: PETCO will produce a copy of its document retention policy that is currently in

2   effect.

3   REQUEST FOR PRODUCTION NO. 34:

4       All documents concerning insurance polices or indemnification agreements that

5   may provide coverage to any Individual Defendant or PETCO, individually or collectively,

6   for any claims or causes of action asserted in this action or that may provide reimbursement

7   for payments made in defense of this action, including, without limitation, loss mitigation

8   insurance or liability-sharing arrangements, including options to purchase such insurance or

9   sharing arrangements, whether acquired before or after the initiation of the litigation.

10  RESPONSE TO REQUEST FOR PRODUCTION NO. 34:

11      In addition to the General Objections set forth above, PETCO objects to this

12  Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

13  WORK PRODUCT DOCTRINE, OVERLY BROAD, UNDULY BURDENSOME,

14  VAGUE, NOT RELEVANT, DUPLICATIVE and PUBLIC RECORD.  Subject to and

15  without waiving such objections, PETCO responds to this Request as follows: counsel for

16  PETCO will confer with counsel for Plaintiffs to clarify and narrow this Request to an

17  appropriate scope.

18  REQUEST FOR PRODUCTION NO. 35:

19      All documents concerning any stockholder agreements and/or voting agreements

20  between Buyout Group and any stockholders of PETCO.

21

22

23

24

25

26

27

28

PETCO ANIMAL SUPPLIES, INC.'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

1    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 35</u>:

2        In addition to the General Objections set forth above, PETCO objects to this

3 Request on the following grounds: ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY

4 WORK PRODUCT DOCTRINE and PUBLIC RECORD.  Subject to and without waiving

5 such objections, PETCO responds to this Request as follows: Other than any such

6 agreements that are included in the terms of the publicly disclosed acquisition transaction

7 between PETCO and the Buyout Group, PETCO is not aware of any such agreements.

8 PETCO will not produce any documents in response to this Request.

9 Dated:  September 8, 2006.

PILLSBURY WINTHROP SHAW PITTMAN LLP
KIRKE M. HASSON
RICHARD M. SEGAL
C.J. MARTIN
501 W. Broadway, Suite 1100
San Diego, CA  92101-3575

By _____  FOR RMS
       Richard M. Segal
    Attorneys for Defendant
    PETCO ANIMAL SUPPLIES, INC.

1    PILLSBURY WINTHROP SHAW PITTMAN LLP
     RICHARD M. SEGAL  156975
2    C.J. MARTIN  228630
     501 W. Broadway, Suite 1100
3    San Diego, CA  92101-3575
     Telephone: (619) 234-5000
4    Facsimile: (619) 236-1995

5    Attorneys for Defendants
     PETCO ANIMAL SUPPLIES, INC., DAVID B. APPEL,
6    SANDRA N. BANE, DAVID T. CHING, JULIAN C.
     DAY, PETER MASLEN and CHARLES W. DUDDLES

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF SAN DIEGO

10

11    _____

12    In re PETCO ANIMAL SUPPLIES, INC.    )    Lead Case No. GIC 869399
      SHAREHOLDER LITIGATION              )
13                                         )    CLASS ACTION
                                           )
14    _____    )    PROOF OF SERVICE VIA UNITED
                                           )    STATES MAIL
15    This Document Relates to:            )
                                           )
16        ALL ACTIONS.                     )
                                           )    Complaint Filed:  July 19, 2006
17                                         )
                                           )
18    _____    )

19        I, Karen J. Costa, the undersigned, hereby declare as follows:

20        1.    I am over the age of 18 years and am not a party to the within cause.  I am

21    employed by Pillsbury Winthrop Shaw Pittman LLP in the City of San Diego, California.

22        2.    My business address is 501 W. Broadway, Suite 1100, San Diego, California

23    92101-3575.

24        3.    I am familiar with Pillsbury Winthrop Shaw Pittman LLP's practice for

25    collection and processing of correspondence for mailing with the United States Postal

26    Service; in the ordinary course of business, correspondence placed in interoffice mail is

27

28

600192292v1                          - 1 -

1  deposited with the United States Postal Service with first class postage thereon fully

2  prepaid on the same day it is placed for collection and mailing.

3      4.      On September 8, 2006, at 501 W. Broadway, Suite 1100, San Diego,

4  California, I served a true copy of the attached document titled exactly **PETCO ANIMAL**

5  **SUPPLIES, INC.'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR**

6  **PRODUCTION OF DOCUMENTS TO DEFENDANTS PETCO ANIMAL**

7  **SUPPLIES, INC., JAMES M. MYERS, BRIAN K. DEVINE AND JOHN G.**

8  **DANHAKL** by placing it in an addressed, sealed envelope clearly labeled to identify the

9  person being served at the address shown below and placed in interoffice mail for collection

10  and deposit in the United States Postal Service on that date following ordinary business

11  practices:

12                     **[See Attached Service List]**

13      I declare under penalty of perjury that the foregoing is true and correct. Executed

14  this 8th day of September, 2006, at San Diego, California.

15

16

17                     Karen J. Costa

18

19

20

21

22

23

24

25

26

27

28

1

Service List

2

In re PETCO Animal Supplies, Inc., Securities Litigation
Consolidated Superior Court Case No. GIC 869399

3

| Counsel for Plaintiffs: | |
|---|---|
| Darren J. Robbins, Esq.<br>Randall J. Baron, Esq.<br>A. Rick Atwood, Jr., Esq.<br>Stephen J. Oddo, Esq.<br>LERACH COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Tel:    (619) 231-1058<br>Fax:    (619) 231-7423 | Brian J. Robbins, Esq.<br>Caroline Schnurer, Esq.<br>ROBBINS UMEDA & FINK, LLP<br>610 West Ash Street, Suite 1800<br>San Diego, CA 92101<br>Tel:    (619) 525-3990<br>Fax:   (619) 525-3991 |
| George E. Barrett, Esq.<br>Douglas S. Johnston, Jr., Esq.<br>Timothy L. Miles, Esq.<br>BARRETT, JOHNSTON & PARSLEY<br>217 Second Avenue, North<br>Nashville, TN 37201-1601<br>Tel:    (615) 244-1601<br>Fax:    (615) 252-3798 | William K. Cavanagh, Jr., Esq.<br>CAVANAGH & O'HARA<br>407 East Adams Street<br>Springfield, IL 62701<br>Tel:    (217) 544-1771<br>Fax:    (217) 544-9894 |
| Joe Kendall, Esq.<br>Willie C. Briscoe, Esq.<br>PROVOST & UMPHREY LAW FIRM,<br>LLP<br>3232 McKinney Avenue, Suite 700<br>Dallas, TX 75204<br>Tel:    (214) 744-3000<br>Fax:    (214) 744-3015 | |
| Counsel for Defendants: | |
| Robert J. Blair, Esq.<br>LATHAM & WATKINS LLP<br>600 West Broadway, Suite 1800<br>San Diego, CA 92101<br>Tel:    (619) 236-1234<br>Fax:    (619) 696-7419 | Eric S. Waxman, Esq.<br>SKADDEN, ARPS, SLATE, MEAGHER &<br>FLOM LLP<br>300 S. Grand Avenue, Suite 3400<br>Los Angeles, CA 90071<br>Tel:    (213) 687-5000<br>Fax:    (213) 687-5600 |

24

25

26

27

28

600192292v1

- 3 -

<u>DECLARATION OF SERVICE BY UPS DELIVERY</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on September 12, 2006, declarant served by UPS, next day delivery, the **DECLARATION OF DAVID T. WISSBROECKER IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEFENDANT PETCO ANIMAL SUPPLIES, INC. TO PRODUCE RELEVANT DOCUMENTS** to the parties listed on the attached Service List. Declarant also served the parties by facsimile.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of September, 2006, at San Diego, California.

ALISON K. SLOAN

LARATION OF DAVID T. WISSBROECKER IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

PETCO STATE

Service List - 9/12/2006    (06-0163)

Page 1 of 2

**Counsel For Defendant(s)**

Robert J. Blair
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA  92101-3375
   619/236-1234
   619/696-7419 (Fax)

Timothy R. Pestotnik
Russell A. Gold
Pestotnik + Gold LLP
401 West A Street, Suite 1600
San Diego, CA  92101
   619/237-3000
   619/342-8020 (Fax)

Richard M. Segal
Pillsbury Winthrop Shaw Pittman LLP
501 West Broadway, Suite 1100
San Diego, CA  92101
   619/234-5000
   619/236-1995 (Fax)

Eric S. Waxman
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Ave., Suite 3400
Los Angeles, CA  90071
   213/687-5000
   213/687-5600 (Fax)

Attorney in Charge
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Anveue, N.W.
Washington, DC  20006
   202/663-6000
   202/663-6363 (Fax)

**Counsel For Plaintiff(s)**

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
   615/244-2202
   615/252-3798 (Fax)

William K. Cavanagh, Jr.
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL  62701
   217/544-1771
   217/544-9894 (Fax)

PETCO STATE

Service List - 9/12/2006   (06-0163)

Page 2 of 2

Randall J. Baron
A. Rick Atwood
Stephen J. Oddo
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)


Brian J. Robbins
Caroline A. Schnurer
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101
   619/525-3990
   619/525-3991 (Fax)

Joe  Kendall
Willie C. Briscoe
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
   214/744-3000
   214/744-3015 (Fax)